**HAYES DRILLING, INC.,**
Plaintiff-Respondent,

v.

**CURTISS–MANES CONSTRUCTION COMPANY, INC., Defendant-Third Party Plaintiff-Respondent,**

v.

**BOARD OF EDUCATION, SOUTH CALLAWAY R–2 SCHOOL DISTRICT, Third Party Defendant, Appellant.**

No. WD 37709.

Missouri Court of Appeals,
Western District.

Aug. 26, 1986.

Thomas E. Tueth, St. Louis (Suelthaus, Kaplan, Cunningham, Yates, Fitzsimmons & Wright, of counsel), for Bd. of Educ.

Clem Fairchild, Kansas City, for Hayes Drilling, Inc.

Richard S. Brownlee, III, Jefferson City for Curtiss-Manes Const. Co., Inc.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

Appellant School District hired an architectural firm, Wm. B. Ittner, Inc., to assist in the planning and design of a new high school building to be located in Mokane, Missouri. The architectural firm and the structural engineer on the project needed to know the approximate location of bedrock on the site, so the School District

employed the Klockow firm to conduct soil borings and make a report. Klockow made 20 borings in the general vicinity of where piers, 117 in all, were to be put down according to subsequent specifications prepared by Ittner, and Klockow's logs of soil borings were attached to the specifications.

Curtiss-Manes was the general contractor to whom the School District awarded the job on its low bid of $4,647,000. That bid included a base bid of $19,800 and a unit price bid for removal of obstructions of $800 per cubic yard submitted by subcontractor Hayes for drilling the piers. Prior to the award of the general contract, respondent's Jene Hayes cursorily reviewed the pier drilling specifications. He acknowledged that the Klockow boring logs contained 18 references to "auger scrapings" and numerous references to "gravel in auger cuttings", "hard to drill" and "very hard to drill", but they did not lead him to believe that there might be difficult subsurface conditions. Hayes did acknowledge that the term "auger scraping" meant to him that Klockow had hit rock and had heard the auger scraping as it passed through the obstruction. He did not ask Klockow for an explanation. The specifications gave the pier drilling contractor the right to perform test borings on its own as its own expense, but Hayes decided that since the logs showed no subsurface water, no test borings needed to be done prior to bidding. Hayes had done work on projects in the Jefferson City and Columbia areas, and had recently finished a job at the Calloway Nuclear Plant, near to Mokane, where it was forced to use a rock auger (below described) to bore through difficult subsurface materials common to the area.

The specifications provided by the architect divided the work and the payment to the pier drilling contractor into two parts, the first part being a base bid (the $19,800) computed on the number of drilled piers, their design length from top to bottom, and their diameters. It included a bell-shaped excavation at the bottom of each shaft and the removal of six inches of rock from the bedrock when it was reached. The second part provided for unit prices for greater or lesser depths of excavation, bell volumes and for excavation of obstructions. The architect later issued an addendum to the specifications, Item No. 6, to clarify paragraph 3.06 of Section C, unit prices which provided: "The unit price quoted for 'obstructions' shall be used to adjust the contract work for removal of obstructions as defined in 3.02 F (Pgs. 2D–6 and 2D–7) *and* rock removed from the bottom of the shaft to obtain satisfactory bearing." Page 2D–6 covers obstructions: "1. If rock, boulders or other unforeseen obstructions are encountered which cannot be removed by standard drilled pier excavation methods, and if such obstructions are not indicated by available subsurface data, removal of such obstructions will be paid for in accordance with the terms of the Contract relative to changes in the work. Standard excavation methods include conventional earth auger, pengo bit, stepped taper bit, teeth on auger or other attachments to auger. 2. Remove such obstructions by hand labor using air-powered tolls (sic), core barrels with drilled pier drilling equipment, or by other safe methods recognized in the construction industry. The Owner's representative must be notified upon encountering any obstruction which cannot be removed with the equipment specified. Further removal of obstructions shall be made only upon the direction of the Owner's representative. The Owner's representative shall reach an agreement with the Contractor as to the volume of the obstruction removed. For the purpose of payment, all such obstructions shall be considered as rock. * * * 4. The work of this Section includes demolition and removal of rock, boulders, concrete, masonry and other subsurface obstructions which are indicated by the Contract Documents, or by the subsurface exploration data and such work will be considered a change in the work."

Hayes started the excavation work for piers on September 30, 1980, with Klockow, the owner's inspector being present, using an earth auger which was capable of drill-

ing small boulders, gravel and chert, which could have caused the scraping sound noted on Klockow's logs. On the second day of drilling, Hayes encountered rock which caused the earth auger with teeth on it to spin and go no farther. The drilling operator immediately called Klockow and advised him that he had gone down as far as he could with an earth auger and asked him what he should do, and that he had encountered rock but it was not all over the hole. Klockow told him that he had to go on down farther. Klockow was looking for solid (bed) rock, which had the proper weight-bearing capacity, and which (then) had to be drilled down another six inches.

The drilling operator then changed to a rock auger. Thomas Lee Taylor, a manufacturer of augers for 17 years, originally made earth augers which had a grader blade bolted onto it, and then was upgraded by placing teeth on it, but it will not cut rock, as will no earth auger with all improvements thereon over the 17 years Taylor had been in business. If the rock is smooth or solid, an earth auger with teeth will just spin around, jerk, and the blade could be broken and torn up. Taylor testified that the rock auger, upon which he had patents, was entirely different from an earth auger. The difference is in both the type of teeth and the configuration. The rock auger has a starter pilot bit with carbide on it, and the teeth are distributed so that it will scrape into the rock and crush it. It is not a standard drilling device unless rock is being drilled, and it is too slow and time-consuming for earth drilling. A core barrel drill serves a similar purpose as a rock auger, but requires a seam so that its teeth may break off chunks of rock no larger than six inches, which go into the barrel and then are lifted to the surface.

Hayes' foreman, Spurlock, told Klockow that he should shoot the elevations because it (what he had struck) was rock which would be paid for under the contract. The elevation measurement was taken (apparently down to the rock which was struck), and Spurlock drilled with the rock auger down to good rock, and measurements were again taken and checked by Klockow. Klockow first agreed that the debris was rock, and then said it was not rock, and when Spurlock filled out the drilled shaft log, noting how much additional rock over the 6 inches of the base contract was removed, Klockow refused to sign it because he believed it would be a contract. Copies of the daily logs, with the amount of rock removed noted, were given to Klockow, who apparently chose not to tell the owner about them because he did not believe they were obstructions.

Upon learning that Klockow felt that Hayes should not get extra payment for using its rock auger, it stopped drilling. On October 3, 1980, a meeting was held at the site with Jene Hayes, two persons from Curtiss-Manes, the School District's Superintendent, Darrel Lee, and Ittner's on-site architect, Tom Kuehling, and a Mr. Satterfield, being present. Hayes told those present that he believed he should be paid for rock removal when he had to use his rock auger. Klockow disagreed, saying that a rock auger was an auger with teeth described in the specifications, and was therefore a conventional excavation method, and that there were numerous references to "auger scrapings" in the boring logs, which indicated to bidders that rock and glacial remains were in the soil. Kuehling heard both sides, and the matter was not resolved. Upon leaving, Hayes stated, "Well, I guess I'm off the job".

On October 8, 1980, the architect wrote a letter to Curtiss-Manes stating that there had been a delay in the drilling work, and it would not be resumed until October 13 when the subcontractor would replace his rig with a larger one. The letter further advised that Klockow had determined that the matrix of clay, granular and rock derived material was removable by an auger with carbide teeth or other methods defined in the specifications, and the material was classified as earth regardless of the size of the drilling rig. Although not because of the letter, according to Hayes, drilling was resumed on October 9, 1980. The architect wrote another letter on the

latter date to Curtiss-Manes stating that Klockow had determined that the subsurface material was removable by standard pier excavation methods, and that it understood the pier driller intended to file a claim for the removal of the material as "rock excavation" for payment purposes. It mentioned that the contract provided that notice in writing to the architect of claims for increase of the contract sum be given, and that no such notice had been received, and assumed that the pier work was proceeding without claims of additional work.

Claim letters were received by the architect after the pier drilling was completed, and in November, 1980, Hayes' counsel wrote a letter to the architect indicating that a claim was being made, and a written claim by Curtiss-Manes was made which was denied by Ittner, the architect. On December 3, 1980, the architect received a copy of an invoice from Hayes to Curtiss-Manes for "unit price adjustments on drilled piers" of $49,152.30, along with a request that a Change Order be written increasing the contract sum by that amount. Suit was then filed, venue was changed to Cole County, the School District was realigned as a third-party defendant, and Hayes dismissed its suit directly against the School District.

Trial was to the court by consent and it found that Hayes was entitled to recover any amounts due it from Curtiss-Manes for additional work done, and the latter was entitled to recover against the School District for any amounts determined to be due Hayes. It was thereafter stipulated that Hayes' actual damages were $43,000, and interest on that amount to the date of judgment was $17,000. This appeal concerns only the issue of liability on the theory of breach of contract.

The School District's Points I and II may be combined. So treated, it is contended that the uncontroverted evidence was that the obstructions encountered by Hayes were foreseen, and that the contractor, to recover for unforeseen obstructions must make an independent investigation of subsurface conditions prior to bidding, which Hayes failed to do. Secondly, it is contended that the obstructions were indicated by available subsurface data, Klockow's boring logs, and as a result Hayes had no right to recover.

Whether the obstructions were foreseen by Hayes was an issue which was for the trial court to resolve, considering the evidence of Klockow's boring logs (which were of only 20 test-borings of the total 117 pier holes to be bored, and which showed "auger scrapings", "gravel in auger cuttings", "hard to drill", and "very hard to drill") as measured against Hayes' actual experience, as testified to by its drilling operator, Spurlock, that on the second day of drilling, the earth auger hit refusal (would not go down any farther), which necessitated Hayes' use of the rock auger. There was nothing in the boring logs of Klockow which even intimated that rock sufficient to stop earth auger drilling would be encountered.

Although the specifications gave Hayes the right to make test-borings on its own at its expense, they did not require it to do so. Hayes was entitled to rely on Klockow's boring logs, which showed no rock which could amount to an obstruction which required removal. The unit price bid for removal of obstructions at $800 per cubic yard showed a concern for that cost of drilling, which is of additional persuasiveness that Hayes did not have to go beyond what was shown on the boring logs prior to bidding—the contingency for unit price remuneration was provided for in the bid which was accepted by the School District.

As to its claim that Hayes was required to make its own independent investigation of subsurface conditions prior to bidding, the School District relies on *Air Cooling & Energy v. Midwestern Const.*, 602 S.W.2d 926 (Mo.App.1980). That case is not in point. There, the plaintiff sought payment for extra and unforeseen work in removing rock from pipe and underground main trenches. There was at least one log indicating rock at 1.1 feet. There was no provision in the bid for removal of rock

obstructions, as defined by the specifications, as here. Contrarily, the bidder in Air Cooling agreed that "All excavation as hereinafter specified shall be unclassified and shall compromise [comprise ?] the satisfactory removal and disposition of all material." The specifications further provided that the contractor shall perform all excavation of every description and of whatever substances encountered. There was nothing in the contract there which provided for unit price for removal of obstructions, or specifications defining obstructions as is present here. Thus, there was nothing that put Hayes on notice that it should make an independent investigation of subsurface conditions. The base bid, plus the unit price for removal of obstructions, was all that Hayes needed to rely upon.

The School District also relies upon *Webb-Boone Paving Co. v. State Highway Commission*, 173 S.W.2d 580 (Mo.1943). That case is also not in point because the contract required bidders to examine carefully the site of the proposed work, the proposal and plans for the contemplated work, and the contractors' proposal stated they had made a careful examination. Payment was made in full for all damages from unforeseen difficulties or obstructions encountered. No misrepresentations of conditions, or warranties as to possible subsurface conditions, were made but it was said that the contract left it up to the bidder to satisfy himself as to conditions attending the specifications of the roadway. Importantly, and as contrasted to this case, there was no unit price for removal of obstructions at all. That clause is in the present contract, and by its insertion, it must have been contemplated that obstructions, such as rock (as defined in the specifications), might be encountered, and that compensation would be paid for their removal.

The parties differ as to the nature of Hayes' claim. The School District denominates it as one for "extra compensation" for extra work outside the scope of the contract, while Hayes contends it is for "additional compensation" within the terms of the contract. Hayes' cited case of *Haughton Elevator Company v. C. Rallo Contracting Co.*, 395 S.W.2d 238 (Mo.App. 1965), defines these two quoted terms at page 245: "Extra work, as used in connection with building contracts, means work of a nature not contemplated by the parties and not controlled by the contract. (Citing authority and use). 'Extra' work is work entirely independent of the contract, something not required in its performance. (Citing cases) Additional work is something necessarily required in the performance of the contract, and without it the work could not be carried out." In the Haughton case, the specifications based the contract price on the seller encountering rock, boulders, etc., in drilling an elevator jack hole, but if such obstructions or unusual conditions were encountered, the contract price would be increased. The situation is similar here: If no obstructions were encountered, the base bid price of $19,800 would control, but if they were encountered, in order to drill the pier holes to bed rock, as required by Klockow, additional compensation would be due on the unit price of material removed— $800 per cubic yard. As in Haughton, Hayes' construction of the term "additional work" is the more reasonable and is correct. The School District's Points I and II are ruled against it.

■ In Point III, the School District contends that Hayes is not entitled to recover because the contract does not allow "extra" compensation for removal of obstructions by standard excavation methods. which includes an auger with teeth, and that a rock auger, which was used, is an auger with teeth. The earth auger, which was used by Spurlock until, according to him, he struck rock, also has teeth. But it is clear that the earth auger would not drill through rock, but would just spin around. It is also in evidence that a rock auger is different from an earth auger, in the type of teeth (carbide bit), distribution or configuration of teeth, size and weight. It operates more slowly than an earth auger, which accounts for Spurlock changing back to an earth auger after he had drilled

through rock, in order to reach the depth required by Klockow. Although the parties are in dispute that what Hayes encountered was rock obstructions, which is the basic question in this case, there is substantial evidence for the trial court to find, as it did, that "Hayes encountered rock, boulders, and other unforeseen obstructions, which could not be removed by standard drilled pier excavation methods, and notified the Owner's Representative of such facts. The owner's representative directed Hayes to proceed to excavate the shafts for the drilled piers, which was a direction to remove any obstructions." Also supported is the finding that Hayes was required to use a rock auger  Point III is overruled.

■ By Point IV, the School District claims Hayes cannot recover because it did not give the architect timely written notice that a claim for "extra" compensation was being made, and it could not proceed with the work until a change order was issued, signed by the owner and the architect. Article 12.1.1, upon which the School District relies, provides: "A Change Order is a written order to the Contractor and the Architect, issued after execution of the Contract, authorizing a change in the Work as an adjustment in the Contract Sum or the Contract Time. * * *." Article 12.3.1 provides that if the Contractor wishes to make a claim for an increase in the Contract sum, he shall give the architect 20 days notice before proceeding, and the claim shall be authorized by Change Order. This case does not involve a requirement for a change order because it is not a change in the work, or an adjustment in the contract sum. The contract sum was specified and fixed as $19,800 base bid, and (plus) a unit price bid for the removal of obstructions at $800 per cubic yard. Neither is changed. The work of drilling 117 piers was not changed. That work, insofar as it relates to removal of obstructions is controlled by paragraph 3.06 of Section C, and 3.02 F, set forth above. Hayes complied with these latter provisions: he notified the owner's representative, Klockow, who directed that the drilling work proceed. The architect was aware that Hayes

would claim additional compensation for rock removal. No written notice to the architect was required each time rock was encountered, which would necessitate many delays if change orders were required. The work was clearly being done within the terms of the contract. Point IV is overruled.

In reviewing the record and the points and authorities advanced, this court finds that there is substantial evidence to support the judgment. It is not against the weight of the evidence, and does not erroneously declare or apply the law. There is no firm belief that the judgment is wrong.

The judgment is affirmed.

All concur.