**COUNTY ASPHALT PAVING COMPANY, INC., Appellant/Cross–Respondent,**

v.

**The 1861 GROUP, LTD., Respondent/Cross–Appellant.**

**Nos. 60735, 60767.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 24, 1993.

Application to Transfer Denied
May 25, 1993.

Robert B. Hoemeke, Eric D. Paulsrud, Lewis, Rice & Fingersh, St. Louis, for appellant.

Jerome Wallach, Michael F. Dandino, The Wallach Law Firm, St. Louis, for respondent.

GRIMM, Judge.

In this court-tried case, plaintiff contractor sued defendant, owner of a parking lot and warehouse, for breach of contract. Contractor contends owner failed to pay the balance due for the excavation and paving of the parking lot. Defendant owner counterclaimed for breach of contract.

The trial court found in favor of owner on contractor's claim, holding that contractor breached the parties' contract. The court dismissed owner's counterclaim for lack of standing. Contractor appealed; owner cross-appealed.

On appeal, contractor alleges (1) it substantially performed, (2) its deviations from the contract did not cause the damages, and (3) it was not at fault for the delay necessitating deviation from the contract. In its cross-appeal, owner alleges it has standing to sue on the contract.

We affirm the trial court's judgment on contractor's claim; we reverse and remand the dismissal of owner's counterclaim.

## I. Background

We review the evidence in the light most favorable to the judgment and in accordance with Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Owner leased portions of its warehouse to various tenants who used the lot as a loading dock and for employee parking.

On October 28, 1986, the parties entered into a contract. The contract basically required contractor to excavate certain areas, lay specific types of rock for the sub base, and apply several layers of asphalt.

The contract provided the job "can be started October 27, 1986." The completion date was "estimated at November 17, 1986." Within a couple of days after the contract was signed, contractor began work on a designated priority area.

In the first few weeks, contractor encountered some obstacles. On the first afternoon of work, owner switched its des-

ignated priority area[1] to another location. Contractor's performance was hindered at the new location because the area was in constant use by tractor-trailers. Additional problems included unexpected subsurface fuel tanks and owner's installation of an underground sanitary line.

On November 18, 1986, the City of Shrewsbury issued a stop-work order because contractor had not obtained a building permit. Following several applications, city gave verbal approval to proceed with paving on November 28, 1986. The building permit was issued December 4, 1986.

Although the record does not disclose exactly when rain fell or the amount, contractor testified it was "probably the rainiest December and November that I have ever experienced." However, contractor did not do anything to protect the subgrade from deteriorating due to the rain. Other water problems also contributed to the accumulation of water on the job site.

On December 4, the same day contractor obtained the building permit, contractor wrote parking lot owner. The letter said that due to the moisture in the existing base stone, contractor would "not be responsible for the asphalt placed on wet base."

In addition, the letter said contractor would lay a portion of the asphalt in one layer instead of two individually compacted layers. Finally, the letter indicated that one type of asphalt would be laid instead of two different types. Owner's general partner testified he did not agree to any of the proposed changes and insisted on compliance with the original contract specifications.

Although owner did not agree to the changes, contractor went forward with the job. It did not use the type rock specified for the sub-grade, nor the type of asphalt or the number of layers the contract called for. Also, contractor did not complete portions of the job. Damaged areas became evident by early January, 1987, and continued to develop thereafter.

Portions of the parking lot have been in continuous use from 1986 through the date of trial. Tractor-trailer trucks use the parking lot on a regular basis, and employees use portions of it for parking.

Contractor sued for $47,566, which it claimed was the balance due and owing under the contract. Owner counterclaimed for $137,000 for breach of contract.

The trial court found that contractor deviated from the contract specifications, and further, "failed to excavate and pave several large areas included in the contract." The court determined these failures constituted a breach of contract.

The trial court further denied contractor's request that the court find the breach was excusable because the heavy rains rendered its performance impossible. The trial court found that contractor could have performed according to contract specifications even after the water accumulated.

In addition, the trial court found the water problems were foreseeable when the contract was executed, and a contingency clause could have been included in the contract. Finally, the trial court concluded contractor was at fault in not obtaining the building permit; it was this delay that enabled the water to accumulate.

## II. Delay in Performance

Contractor contends the trial court erred in holding that it breached the contract by delay and inaction causing excessive water to accumulate. Contractor argues (1) it was not at fault, "in that the delays were caused by [owner's] switch of work areas," and by owner's "failure to clear truck traffic and [its] other contractors," and (2) the water from the heavy rain, broken water mains and from under the truck dock was "unforeseen and beyond [contractor's] control." We disagree.

■ The testimony conflicted as to who bore the responsibility to obtain the building permit. We defer to the trial court to resolve such conflicts. Rule 73.01. In ad-

---

**1.** The contract specifications divided the lot into two areas. One area, the priority area, was to be excavated and paved first because a tenant was to move in soon.

dition, contractor's bid included a $500 charge for permits.

Heavy rainfall occurred, at least in part, during the time the project was delayed by the failure to have the building permit. Sufficient evidence supports the trial court's conclusion that contractor was responsible for significant delay by its failure to timely procure a building permit.

As to the other contingencies complained of, they do not excuse contractor's breach.

It is the general rule that when a person by his contract charges himself with an obligation possible to be performed, *he must perform it,* unless its performance is rendered impossible by the act of God, by the law, or by the other party. In case a party desires to be excused from performance in the event of contingencies arising, it is his duty to provide therefor in his contract.

*Stein v. Bruce,* 366 S.W.2d 732, 734 (Mo. App.W.D.1963) (emphasis original).

Moreover, with the exception of the water mains, the evidence supports the trial court's conclusion that the contingencies contractor complains of were foreseeable. Contractor's contention that the delay was caused by the switch in work areas is without merit; the switch was made on the first afternoon of work. Also, contractor knew that one of the work areas would be in use. As to the rainfall, contractor's on-site representative, who bid the job, testified he understood when he signed the contract that there would be problems with rain in December.

In addition, contractor included a provision in the contract for extra pay in the event that it had to dig out soft areas. By its terms, that provision was limited to a particular portion of the lot. However, contractor's president testified that the clause was not limited to the area mentioned in the contract provision. Thus, contractor was on notice as to the potential for wet conditions. *See, e.g., Hayes Drilling, Inc. v. Curtiss–Manes Constr. Co., Inc.,*

715 S.W.2d 295, 299 (Mo.App.W.D.1986). Point denied.

### III. Substantial Performance

For its next point, contractor alleges the trial court erred in holding it breached the contract because contractor rendered substantial performance in good faith. Contractor specifically claims (1) it "acceded to [owner's] demand to pave over a wet subsoil against [contractor's] warnings," and (2) "the deviations from the contract specifications were reasonable under the circumstances and were not material." We disagree.

The parties' contract included the following specifications:

(1) Place 3 inches of 2–inch minus [2] limestone and compact it.
(2) Place 3 inches of 1½–inch minus limestone and compact it.
(3) Place 2 inches or more of 1–inch minus limestone and compact it.
(4) Specifications 1–3 above are to result in a finished sub-base of 8–inches compacted.
(5) Apply liquid asphalt primer to limestone surface.
(6) Lay a hot type X mix asphalt and compact it; result should be a minimum of 2–inches of compacted X-mix.
(7) Lay a hot type special C-mix asphalt and compact it; result should be a minimum of 1–inch compacted special C-mix.

The record includes sufficient testimony to permit the trial court's finding that contractor did not comply with these specifications. Contractor did not use any 1½–inch minus limestone in the base. Only a single layer of asphalt was laid by contractor; that asphalt consisted largely of C-mix asphalt.[3] Also, there was evidence that contractor failed to excavate and pave certain areas.

On approximately January 5, 1987, several problems with the paving were observed by owner's general partner. These included subsidence of the asphalt (concave areas

---

**2.** "Minus" refers to the fine particles in the limestone mix that fill the voids and act as mortar.

**3.** X-mix has a larger aggregate and yields a stronger material. C-mix seals the asphalt to keep moisture from getting into the paving.

caused by weakness or a void in the sub-structure), penetration of the asphalt by the legs of a tractor trailer, a broken grate caused by unevenness of the surrounding asphalt, and cracked grates caused by soft sub-base. Also, the pavement was not smooth and even. Other problems were also described.

■ In the context of construction contracts, "literal and precise performance is not demanded and slight or trivial defects, imperfections or variations will not bar the action if the contractor has made an honest endeavor to comply and has substantially done so." *Quality Wig Co., Inc. v. J.C. Nichols Co.*, 728 S.W.2d 611, 619 (Mo.App. W.D.1987); *see e.g.*, *McAlpine Co. v. Graham*, 320 S.W.2d 951, 954 (Mo.App.E.D. 1959).

Here, the evidence supports the trial court's finding that contractor breached the contract. The size of rock and the mix of the asphalt affected the compactness of the pavement, and thus its strength and durability. The departure from these specifications was unauthorized and intentional.

■ In addition, contractor's warranty of a workmanlike product was violated by laying the asphalt on a wet subsurface. The testimony indicates laying asphalt on a wet subsurface can cause the problems to which the parties testified.

■ We fail to see how contractor's allegation that it acceded to owner's demand to pave over wet subsoil supports its contention that substantial performance was rendered. Contractor seems to argue that the contract specifications were modified or waived by its December 4, 1986 letter.

However, owner's general partner testified he did not agree to the terms of the letter. He further testified he told contractor's on-site supervisor to dig out the soft spots and then follow the contract specifications. We defer to the trial court's determination as to the credibility of the witnesses. We find no modification and no waiver of the contract terms. Point denied.

## IV. Causation

■ For its final point, contractor alleges the trial court erred in ruling that it breached the contract by failing to follow the contract specifications "because there was no evidence that [its] deviation from the exact contract specifications was the proximate cause of the parking lot problems in that [owner's] experts said that the problems resulted from soil conditions." Contractor further contends that because the experts "did not know all the circumstances under which [contractor] acted, [they] could not state that [contractor] did not perform in a proper manner." We disagree.

One of owner's experts testified that the degree of density of the sub-grade was below acceptable levels. One expert testified that the failure to use minus material causes movement in individual rocks because "[t]here's nothing to bind them," causing the surface to be unstable. Further, expert testimony indicated that C-mix doesn't have the strength or tolerance of X-mix. He also said the use of two layers would add strength to the surface.

We find there is sufficient expert testimony regarding causation to support the trial court's judgment. *See e.g.*, *Abrams v. B–Mark Pools, Inc.*, 616 S.W.2d 143, 145 (Mo.App.E.D.1981).

One final comment regarding contractor's contention that the experts did not know all the circumstances under which contractor acted. We note that during the testimony of the experts, the only time such an objection was made was in response to a question asking whether the work done deviated from the contract specifications. No such objection was made to expert testimony on the issue of causation. Thus, we do not reach this issue. *See Halamicek Bros., Inc. v. R & E Asphalt Serv., Inc.*, 737 S.W.2d 193, 196–97 (Mo. App.E.D.1987). Point denied.

## V. Counterclaim

■ In its cross-appeal, owner alleges the trial court erred in holding it lacked standing to bring its counterclaim. Owner contends its counterclaim "was founded on breach of contract to which [it] was a party and therefore had standing to sue."

Owner is a limited partnership. Richard T. Lammert is its sole general partner. The contract between contractor and owner was signed by Mr. Lammert.

Contractor's petition alleged that Mr. Lammert "in his capacity as the general partner and agent [of owner] entered into" the agreement with contractor. Owner's answer admitted this allegation, and neither party contests this issue.

Approximately two months after it entered into the contract, owner sold the property. At the time this action was instituted, the property was owned by another limited partnership, Weil Avenue Associates. Owner is a limited partner in Weil Avenue Associates.

The trial court dismissed owner's counterclaim without prejudice because owner "lacks standing to bring a Counterclaim." The trial court found, "[i]n this case, the proper party would be the general partners of the Weil Avenue Associates or the [owner] after having complied with § 359.571 [4] et seq." Section 359.571 pertains to derivative actions brought by limited partners.

The trial court erred in making this conclusion. At the time the parties entered into the contract, owner was the sole owner of the property. It brought the counterclaim in its own capacity as the former owner of the property and as the party that contracted with contractor. Nothing in the record indicates owner was acting in a representative capacity on behalf of Weil Avenue Associates. As a result, § 359.571 is not pertinent.

Contractual obligations "can only be enforced by one who is a party to the contract or in privity with it." *Automobile Club Inter–Ins. Exch. v. Farmers Ins. Co., Inc.*, 646 S.W.2d 838, 840 n. 1 (Mo.App.E.D. 1982); *see also McFarland v. O'Gorman*, 814 S.W.2d 692, 694 (Mo.App.E.D.1991). Owner, through its general partner, was the contracting party. Weil Avenue Associates was not a party to the contract and had no interest in the property at the time the parties entered into the contract. As such, Weil Avenue Associates could not bring an action based on that contract.

4. All statutory references are to RSMo 1986.

Owner was the proper party to file the counterclaim.

Owner asks us to enter the judgment on its counterclaim that the trial court should have entered. From the record before us, we are unable to do so. We note in passing that generally, when a contractor breaches its contract by defective performance, the measure of damages is either "cost of repair" or "diminution in value." See *Hernandez v. Westoak Realty & Inv., Inc.*, 771 S.W.2d 876, 880 (Mo.App. E.D.1989). However, an "owner may not recover for the cost of reconstruction and completion in accordance with the contract if this would involve unreasonable economic waste, that is, destruction of usable property." *White River Dev. Co. v. Meco Sys., Inc.*, 806 S.W.2d 735, 741 (Mo.App.S.D. 1991).

The judgment of the trial court on contractor's petition is affirmed. The judgment of the trial court on owner's counterclaim is reversed and the cause is remanded. Costs are assessed to contractor.

CRANDALL, P.J., and PUDLOWSKI, J., concur.