**The MISSOURI DEPARTMENT OF TRANSPORTATION, ex rel. PR DEVELOPERS, INC., Plaintiff/Respondent,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA and Robertson Contractors, Inc., Defendants/Appellants.**

No. ED 79860.

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 5, 2002.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 27, 2003.

Application for Transfer Denied
March 4, 2003.

---

1. All statutory references are to RSMo 2000, unless otherwise noted.

Mark G. Arnold, St. Louis, for respondent.

Richard R. Huck, St. Louis, Richard W. Miller, Kansas City, for appellant.

CLIFFORD H. AHRENS, Judge.

Robertson Contractors, Inc. ("Robertson") and the SAFECO Insurance Company of America ("SAFECO"), surety for Robertson, appeal from the judgment of the Circuit Court of St. Louis County, after jury verdicts which awarded damages to PR Developers, Inc. ("PRD") for breach of contract. SAFECO also appeals from the judgment of the trial court following a jury verdict which awarded damages to PRD for vexatious refusal to pay and for attorneys' fees. This case resulted from a construction project ("Project") of the Missouri Highway and Transportation Commission ("MHTC" or "MoDOT")[1] in which Robertson was the general contractor and PRD was a sub-contractor. A number of difficulties arose during the Project, which PRD alleged caused substantial delays to the completion of its work. PRD also alleged that it performed extra tasks not included in its sub-contract for which it did not receive full compensation. We affirm in part and reverse in part.

When viewed in the light most favorable to the verdict, the record shows that in 1998 MHTC took bids for the Project for the construction of a bridge, embankments, ramps and roadways at the interchange of Interstate Highway 55 ("I–55") and Routes H and HH. Robertson was the general contractor, and PRD was the sub-contractor for the base rock and paving portions of the Project. The MHTC bid materials obtained by Robertson and PRD informed bidders that above-ground high voltage electrical utility lines were located in the northwest portion of the Project which needed to be raised by AmerenUE for embankment and ramp work in that area. MHTC had already informed AmerenUE of the need to do this for the Project.

Robertson used PRD's bid in submitting its own bid for the Project to MHTC, and MHTC awarded the contract ("Contract") for the Project to Robertson on October 2, 1998. Robertson and PRD entered into a

---

1. The record before this Court reflects that the parties have frequently used "MoDOT" to refer to both the MHTC and MoDOT. To minimize confusion, we adopt this convention as well.

written sub-contract ("Sub–Contract") on September 29, 1998 based on PRD's bid to Robertson. The Contract incorporated by reference the MTHC's Standard Specifications for Highway Construction ("Specifications"), and required that the work on the Project be done in accordance with the Specifications. The Contract provided that Robertson would have one hundred thirty working days to complete the Project, starting from March 15, 1999. The Specifications stated that if the contractor experienced delays due to the owners of utility facilities, the delay would be figured into the count of working days, and that would be the contractor's sole compensation from MHTC. According to the Specifications, the contractor would be subject to liquidated damages if it failed to complete the Project on time. The Sub–Contract incorporated by reference the Contract and the Specifications. The Sub–Contract stated that time was of the essence, but did not specify a start date. Under Special Provision "B" of the Sub–Contract, PRD would be assessed that part of any charges assessed against Robertson by the State of Missouri because of a failure to complete the Project on time which were due to PRD's operations. Pursuant to the Contract, Robertson obtained a contract bond from SAFECO.

On or shortly after Robertson entered into the Sub–Contract with PRD, Robertson had advised PRD that it intended to work on the embankments for the Project throughout the winter, weather permitting. Shortly after PRD signed the Sub–Contract, P. Mitchell Parris ("Parris"), president of PRD, had a conversation with either Ben Robertson or Ben Holt ("Holt"), president and vice-president of Robertson respectively, in which Parris was told that Robertson wanted PRD prepared to begin its work on March 15, 1999. PRD verbally agreed ("the Agreement") to this starting date, and committed itself to starting the Project on March 15th, expecting to be done within eighty working days, if not sooner. Around the time that the bid was let, Parris, responding to an inquiry from Robertson, had indicated that PRD would like to start work on the west side of the Project.

Parris visited the site of the Project in February, 1999, and observed that neither the embankments on the west side of the Project nor the embankments on the east side of the Project were completed. Mike May, Robertson's designated Project superintendent, informed Parris that the power lines needed to be relocated. Mike May also told Parris that the power lines would be moved by April 15, 1999, and that the Project site would be ready for PRD to begin work. Parris also expressed concerns to Mike May about the sandy subgrade material. On March 15, 1999, PRD submitted a value engineering proposal to Harvey Graham, a MoDOT engineer on the Project, sending a copy to Robertson as well, suggesting the use of soil cement to help stabilize the sandy subgrade material that Robertson was to use for the embankments. This value engineering proposal was rejected by MoDOT.

PRD was not able to begin its work on the Project until the end of May, 1999, and had to begin work on the east side of the Project, a delay of approximately fifty working days. Mike May had left the Project site by that time. PRD encountered problems with the tacks and the grades on the east side ramps which caused several days of delay, which required restaking the tack lines and grades by MHTC. PRD began to lay base rock over the sandy subgrade of the ramps placed by Robertson using the subgrade material specified by MHTC, but soon ran into trouble. Though the subgrade had been saturated, it still "deformed" under the weight of PRD's trucks, causing them

to get stuck. PRD worked around this problem, suffering approximately a one-day delay.

Having laid the base rock over the sandy subgrade on the east side of the Project, PRD began paving over the base rock on June 16, 1999, and again experienced problems. The sandy subgrade deformed and rutted under the weight of PRD's paver, pushing out from under the sides of the base rock. PRD eventually dealt with the problem by constructing and laying out plywood tracks for the paver to run over the base rock to distribute the weight of the paver, which caused a delay of eleven work days.

PRD eventually finished the paving on the ramps on the east side of the Project by July 14th, and was ready to begin working on the west side of the Project by July 19th. Robertson had not yet completed the embankments and subgrade on the west side at that time, in part due to further staking problems by MoDOT, and it was not until August 16th that the subgrades on the west side ramps were ready for PRD to work, a delay of twenty working days, during which PRD could not use its paving equipment. PRD had problems on the west side with the subgrade when laying the base rock similar to those it had on the east side, causing about a day's delay. PRD handled the paving on the west side ramps as it had on the east side, using plywood tracks, and again experienced deformation of the sandy subgrade, resulting in a day's delay when the plywood track split over a portion of the deformed sandy subgrade and knocked out one of the sensors on PRD's paver.

PRD also experienced a delay of half of one day on September 2, 1999 due to grading problems at the tie-in between a ramp on the west side and the highway, again lacking proper staking. Work ran relatively smoothly until September 23, 1999, when PRD lost four working days due to the bridge being three inches too low where it was supposed to join Route HH. PRD experienced another delay from October 6th to October 13th, a loss of five working days, due to continued problems with grading and MoDOT's handling of the grade problems. PRD completed its final pour of concrete using its equipment on October 21st, though it continued on the job until January 20, 2000.

PRD also claimed that throughout the course of the Project, it did various extra tasks which were not part of its duties under the Sub–Contract pursuant to oral agreements with Robertson. The Sub–Contract specifically stated that any extra work had to be authorized by Robertson in writing.

On December 10, 1999, PRD sent a detailed letter to Robertson and SAFECO concerning "the substantial claim for unpaid moneys that we [PRD] have regarding this job [the Project]." A copy of the contract bond and the Sub–Contract were attached to the letter. The letter stated the principal causes for the "disruption and delay" which damaged PRD were that: the jobsite was not ready for PRD on March 15, 1999; MoDOT failed to provide proper material for the subgrade for the ramps, which "deformed" under the weight of PRD's equipment; and MoDOT routinely failed to provide proper stakes and grades in a timely manner so as to permit PRD to do its work. PRD also stated in this letter that it had incurred extra costs in doing portions of its work due to acts done by MoDOT. This letter did not specifically state that PRD was making a claim against Robertson or against SAFECO under the contract bond, or that Robertson had breached the Sub–Contract.

Ann Hester ("Hester"), a senior claims representative for SAFECO, reviewed the December 10th letter, and determined that

PRD's claims dealt with the actions of MoDOT, not Robertson. Hester contacted Robertson, which informed her that the December 10th letter involved claims for which MoDOT, not Robertson, was responsible. On December 20, 1999, Hester sent a letter to Parris as president of PRD, which stated that SAFECO was investigating the matter, that it had forwarded the December 10th letter to Robertson "[s]o that we may determin[e] it's [sic] position with regard to your claim[,]" that SAFECO was requesting that PRD fill out the attached affidavit of claim form, and that SAFECO reserved all rights and defenses available to itself and Robertson at law and in equity. PRD sent Hester a letter dated January 12, 2000 with the attached affidavit of claim form dated January 13, 2000 asking Hester to advise PRD as soon as possible of the status of "this matter." The affidavit attached to the January 12th letter incorporated by reference the letter of December 10, 1999, and averred that Robertson was indebted to PRD for labor and materials furnished to Robertson as described in the December 10th letter, and that notice of non-payment was sent to Robertson and SAFECO in the December 10th letter.

On January 24, 2000, PRD filed suit against Robertson and SAFECO for breach of contract and for vexatious refusal to pay by SAFECO. In its answer, Robertson denied that it had breached the Sub–Contract, denied any liability for PRD's claims in its petition, and asserted a counterclaim against PRD. SAFECO sent a letter to Parris dated February 9, 2000, acknowledging receipt of PRD's letter of January 12th, and noting that "a formal

response is no longer appropriate[,]" given PRD's suit against Robertson and SAFECO, as the issues raised in the January 12th letter would be addressed in the litigation.[2]

On January 19, 2000, Holt wrote to Parris concerning the December 10, 1999 letter to the effect that Robertson was assuming that PRD desired Robertson to submit a claim on its behalf to MHTC for consideration and payment.[3] Parris responded in a letter dated January 26th which replied that PRD's claim was against Robertson and SAFECO, as PRD had its Sub Contract with Robertson. Robertson did submit a claim to MHTC on February 9, 2000, on behalf of PRD concerning the damages listed in the December 10, 1999 letter. MHTC denied the claim because the Contract did not permit a sub-contractor to make a claim against it. Robertson submitted a claim to MHTC on July 14, 2000 based mainly on PRD's claims against it, save for the claim concerning the provision of inadequate subgrade material, with affidavits from Robertson and PRD, and attaching PRD's letter of December 10, 1999, as well as PRD's petition against Robertson and SAFECO. The Claims Commission for MoDOT ultimately offered $110,293.84 "as complete and full compensation for any and all delays to the contractor and all subcontractors" in its letter of February 22, 2001 to Holt, and requested releases from Robertson and PRD.

On November 22, 2000, Robertson filed a motion for leave to file a third-party petition to join AmerenUE as a defendant, and on February 13, 2001, a motion for leave to file a third-party petition against

2. SAFECO continued to receive information concerning PRD's claim through the discovery process, and decided that there was a valid dispute between its principal, Robertson, and PRD, and that it could not determine

if Robertson owed PRD money without a trial on the merits.

3. As a subcontractor, PRD could not directly submit a claim to MHTC.

MHTC. Both of these motions were denied. PRD's suit against Robertson and SAFECO was tried from March 12 to March 21, 2001. The jury returned verdicts in favor of PRD on its claims, and awarded: damages for delay of $1,581,192.50 against Robertson and its surety, SAFECO; damages of $143,894.78 and $111,715.50 against SAFECO for vexatious refusal to pay and attorney fees respectively; and $74.810.16 against Robertson for non-delay damages, and the court entered its judgment thereon on March 21, 2001. Robertson and SAFECO now appeal.

■ In its first point on appeal, Robertson contends that the trial court erred in submitting PRD's verdict-directing Instruction No. 7, in failing to grant Robertson and SAFECO a judgment notwithstanding the verdict ("JNOV"), and in failing to grant Robertson and SAFECO a new trial "because there was not sufficient competent evidence that Robertson made the specific promises set forth in Instruction No. 7[.]"[4] Instruction No. 7 provided that the jury should find for PRD if it believed that PRD and Robertson entered into an agreement in which PRD agreed to provide base rock and concrete paving, and Robertson agreed:

[T]o have the job site ready for plaintiff [PRD] to proceed by March 15, 1999; to maintain the subgrade during all construction operations . . . .; to timely provide plaintiff [PRD] with a job site on the west side of the interchange that would permit plaintiff [PRD] to perform its machine paving work after it had completed its machine paving work on the east side of the interchange; to give the work in progress the personal attention of a competent and reliable superin-

tendent with full and final authority to act for Robertson Contractors; to give the [MHTC] engineer reasonable notice of intent to perform work in a particular area of the project in order to afford the [MHTC] engineer sufficient time to set construction stakes establishing lines, slopes and profile grade;

The instruction also required the jury to find that PRD had performed its obligations, and that Robertson had failed to perform its agreement in any respect, thereby damaging PRD.

■ In reviewing an instruction, this Court views the evidence and the inferences in the light most favorable to the instruction, and disregards contrary evidence. *Burns National Lock Installation Company v. American Family Insurance Company*, 61 S.W.3d 262, 270 (Mo.App. 2001). We will reverse on instructional error only where the instruction misled, misdirected, or confused the jury, and the instruction resulted in prejudicial error. *Id.* The principal question in reviewing a trial court's denial of a motion for directed verdict or JNOV is whether or not the plaintiff made a submissible case. *Mogley v. Fleming*, 11 S.W.3d 740, 747 (Mo.App. 1999). In order to make a submissible case, substantial evidence is required for each and every fact essential to liability. *Id.* The issues of whether or not the evidence is substantial and whether or not the inferences drawn are reasonable present questions of law. *Id.* This court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences. *Id.* "Denial of [a] motion for a new trial is reviewed for abuse of discretion." *Uptergrove v. Housing Authority of City of*

---

4. Robertson's Point One on appeal is incorporated by reference as SAFECO's Point Six on appeal. We analyze them jointly.

*Lawson,* 935 S.W.2d 649, 652 (Mo.App. 1996). A trial court abuses its discretion "when its ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary as to shock the sense of justice and indicates a lack of judicial consideration." *Whitworth v. Jones,* 41 S.W.3d 625, 627 (Mo.App.2001).

▆ PRD's president, Parris, repeatedly stated in his testimony that Robertson wanted PRD ready to start work on the Project on March 15, 1999. The basis for this testimony was a conversation between Parris and either Ben Robertson or Holt in October, 1998, after PRD signed the Sub–Contract, in which Parris was told that Robertson wanted PRD prepared to begin its work on the Project on March 15th. Parris agreed to be ready, and he and his firm acted in reliance upon that agreement. In its brief, Robertson contends that this testimony violated the parol evidence rule. We disagree.

▆ "There is a general consensus that when the parties have reduced their final and complete agreement to writing, the parol evidence rule does not permit the writing to be varied or contradicted and this principle is a substantive rule of law and not a rule of evidence. The parol evidence rule does not prevent relevant evidence from being admitted; but prohibits the trier of fact from using that evidence to vary, alter or contradict the terms of a binding, unambiguous and integrated written contract. The essence of the parol evidence rule is, therefore, that evidence outside a completely integrated contract cannot be used to change the agreement." *State ex rel. Missouri Highway and Transportation Commission v. Maryville Land Partnership,* 62 S.W.3d 485, 489 (Mo.App.2001) (citations omitted). The parol evidence rule bars evidence of prior or contemporaneous oral agreements that vary or contradict the terms of an unambiguous, final, and complete writing, absent fraud, mistake, accident, or duress. *Poelker v. Jamison,* 4 S.W.3d 611, 613 (Mo.App.1999).

▆ The trial court effectively held that the Sub–Contract was not a completely integrated document, and that Parris's testimony concerning the agreement to have PRD start work, or be prepared to start work, on March 15, 1999, did not vary or contradict any terms of the Sub–Contract, which was silent as to the start date for PRD. If a written agreement is not completely integrated, the parol evidence rule has no application, and parol evidence is competent to resolve the meaning. *Incentive Realty, Inc. v. Hawatmeh,* 983 S.W.2d 156, 162 (Mo.App.1998). "If a writing omits a consistent additional term that is either agreed to for separate consideration or might naturally have been omitted in the circumstances, the agreement is considered only partially integrated and collateral facts and circumstances may be introduced to prove consistent additional terms." *State ex rel. Missouri Highway and Transportation Commission,* 62 S.W.3d at 489.

Parris's agreement with Robertson concerning the March 15th start date does not contradict any terms of the Sub Contract, nor did Parris and Robertson make the agreement prior to or contemporaneous with PRD signing the Sub–Contract. Accordingly, Parris's testimony concerning the agreement did not violate the parol evidence rule.

▆ Robertson also contends that there was no consideration for the Agreement, and that it therefore fails. "Consideration sufficient to support a contract is composed of: (1) a detriment to one party, or, (2) a benefit to the other party." *Gordon A. Gundaker Real Estate Company, Inc. v. Missouri Real Estate Commission,*

878 S.W.2d 466, 470 (Mo.App.1994). "Valuable consideration may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility, given, suffered or undertaken by the other." *Moore v. Seabaugh,* 684 S.W.2d 492, 496 (Mo.App.1984). Slight consideration is enough to support a promise. *Id.* Parris testified that by agreeing to be ready to start on March 15, 1999, PRD, a single project company, was unable to bid on any other projects and undertake work while it was committed to working as a sub-contractor for Robertson. By agreeing to be ready to start on March 15th, PRD effectively committed equipment and labor to the Project, which resulted in those resources being unavailable for other work in March, April and May, 1999. Parris also stated that PRD had estimated that its work would take eighty work days, and had expected to be able to work on other projects beginning in August, 1999. PRD could have started work on the Project much later without causing any difficulties to Robertson, which had one hundred thirty days to complete the Project for MHTC. The delays that the Project experienced resulted in PRD not being able to allocate its equipment and employees to other projects until late October, 1999. PRD's agreement to commit its equipment and personnel to starting on March 15th, earlier than it needed to do to perform the Sub–Contract work, was sufficient consideration to support the Agreement.

█ Robertson also argues that there was a lack of evidence to support the existence of the Agreement, other than the testimony of Parris. Missouri courts have held that the testimony of a single witness is sufficient to establish any fact, if accepted as true by the trier of fact, even if the witness is a party to the action. *Garren v. Smith,* 803 S.W.2d 184, 187 (Mo.App.1991);

*Scherffius v. Orr,* 442 S.W.2d 120, 124 (Mo.App.1969). From its verdict, the jury in the instant case obviously found Parris's testimony to be convincing.

Robertson also argues that there was no evidence that it agreed to have its work completed on the west side of the Project so that PRD could begin working there as soon as PRD finished work on the east side of the Project.

█ There was no explicit promise in the Contract, Sub–Contract, or the Agreement that Robertson would have the west side of the Project ready for PRD to work on after the latter had finished its work on the east side of the Project. However, Missouri courts have stated, "It is sufficiently obvious that a contract for the construction of a building, even in the absence of an express stipulation upon the subject, implies as an essential condition that a site shall be furnished upon which the structure may be erected." *Statler Manufacturing, Inc. v. Brown,* 691 S.W.2d 445, 449 (Mo.App.1985) (quoting *Guerini Stone Co. v. P.J. Carlin Construction Company,* 248 U.S. 334, 340, 39 S.Ct. 102, 104, 63 L.Ed. 275 (1919)). By extension, a sub-contract requiring a sub-contractor to lay base rock and pour concrete for a highway implies as an essential condition that a site shall be furnished upon which the base rock and concrete may be placed, even absent an express stipulation to that effect.

█ Robertson also contends that there was no evidence that it "agreed to maintain the subgrade for the benefit of PRD[.]" The Sub–Contract incorporated the Specifications. The Specifications require the "contractor" to maintain the subgrade "during all construction operations." Lynelle Luthor, the MoDOT project manager, testified that the definition of "contractor" as stated in the Specifications meant Robertson, though she later testified that it was her interpretation that

"contractor" in the MHTC contract specification could mean any of the sub-contractors on the Project as well as Robertson, the general contractor. She did not state that PRD had to maintain the subgrade, but rather that keeping the sand subgrade sufficiently wet was a matter "between the prime contractor [Robertson] and the subcontractor [PRD]." Harvey Graham, one of the MoDOT on-site engineers, testified in his deposition that it was Robertson's duty to keep the fill material saturated. Parris repeatedly stated in his testimony that the sub-grade was not the responsibility of PRD. The Specifications do state that when the base rock is laid it becomes a sub-grade, but there does not appear to be any provision for shifting responsibility for maintaining the sub-grade after the base rock is laid. Luthor testified that the tracks of PRD's paver in the initial paving ran on the sand sub-grade, not base rock. "Whether the terms of an agreement are ambiguous is a question of law." *Frager v. Frager*, 949 S.W.2d 173, 176 (Mo.App. 1997). "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in the construction of the terms." *Id.* The Contract and Sub-contract, both of which incorporate the MHTC contract specifications, are ambiguous as to the meaning of which "contractor" was responsible for the sub-grades. Resolving this ambiguity was a matter within the purview of the jury, and there was sufficient evidence for the jury to decide that the responsibility of maintaining the sub-grade belonged to Robertson. *Id.*

Robertson also argues that there was no evidence that it "agreed ... to have a superintendent on the Project at all times[.]" Section 108.3.3 of the MHTC contract specifications incorporated in the Contract and Sub–Contract states that:

> The work in progress shall receive the personal attention of the contractor or of a competent and reliable superintendent who shall have full and final authority to act for the contractor. If authority is delegated to a superintendent, the contractor shall notify the engineer in writing, stating the name of the person authorized to act as superintendent, and stating the name or names of persons authorized to sign the various documents such as the weekly reports, change orders, force account statements, labor payrolls and any other documents that may be required during the progress of the work.

Whether or not this was intended for the benefit of MHTC, Robertson, or any subcontractors, it was incorporated by reference into the Sub–Contract. According to Luthor's testimony, Robertson designated Mike May as the project superintendent at the preconstruction conference. Holt testified that May left the Project site sometime near the end of May, 1999, and Larry Stotz became the on-site superintendent overseeing the bridge operations, though the record does not reflect that the MoDOT engineer was notified in writing of this alleged change in project superintendents. Parris testified that May left the Project to work for a Robertson project in Arkansas before PRD was able to start work, that MoDOT complained about a lack of supervision on the Project, and that Ben Robertson had asked Parris if he would act as Robertson's designated superintendent, which he declined to do. Parris also testified about the lack of a superintendent causing problems with MoDOT.

Graham testified in his deposition that Robertson left the Project on May 27, 1999 to work in Arkansas, and did not return until July 19, 1999. PRD's expert witness, David Whitt, a construction manager with degrees in civil engineering and law, testi-

fied that he reviewed documents from the Project, the notes of Parris, and the Project diary of MoDOT employee Johnny Hughes, which stated a number of days on which the "prime contractor," Robertson, was not active on the job. Whitt opined that Robertson, at least with regard to grading, was not providing any on-site superintendent for the work performance.

Robertson also asserts that there was no evidence that it agreed to give the MoDOT engineer notice of intent to perform work in specified areas. We disagree. MHTC contract specification Section 105.8 states that: "The contractor shall be responsible for giving the engineer reasonable notice of intent to perform work in a particular area of the project in order to afford the engineer sufficient time to set construction stakes establishing lines, slopes and profile grade." This contract specification was incorporated by reference in the Contract and Sub–Contract, whether it was for the benefit of MHTC, Robertson, or PRD. Parris also testified that PRD had problems with MoDOT and staking in part due to the lack of a superintendent representing Robertson.

Although the evidence presented at the trial was conflicting at times, there was sufficient evidence, weighed by the jury, to support the jury's conclusion regarding the facts hypothesized in Instruction No. 7. The trial court did not err in denying the motion for JNOV, and did not abuse its discretion in denying the motion for a new trial. Point denied.

 In its second point on appeal Robertson asserts that the trial court erred in submitting Instruction No. 7 and in failing to grant Robertson and SAFECO a JNOV on PRD's delay claims, and in failing to grant a new trial because "there was not

sufficient competent evidence to support the jury's verdict that any of the alleged contractual breaches by Robertson caused any of the delays or damages allegedly incurred by PRD in that PRD failed to submit any evidence establishing that actions of Robertson were a substantial contributory factor to the alleged delay and the alleged delay was not due to the acts or omissions of third persons or other events...." [5]

 It is irrelevant whether or not Robertson's actions or inaction caused the delays and consequent damages to PRD or were even a substantial contributory factor. It is the general rule that when a party in a contract charges itself with a duty possible to performed, it must perform it, unless the performance is made impossible by the act of God, by the law, or the other party. *Farmers' Electric Cooperative, Inc. v. Missouri Department of Corrections,* 977 S.W.2d 266, 271 (Mo. 1998). If a party wishes to be excused from performance in the case of various contingencies arising, it is the party's duty to provide this excuse in the contract. *County Asphalt Paving Company, Inc. v. 1861 Group, Ltd.,* 851 S.W.2d 577, 580 (Mo.App.1993). In addition, if the fulfillment of a contract depends on the consent or act of a third party, the contract is unenforceable until the third party consents or acts. *Werner v. Ashcraft Bloomquist, Inc.,* 10 S.W.3d 575, 579 (Mo.App. 2000). However, if a party to a contract unconditionally undertakes to perform an act that is not impossible, but merely requires a third party to consent or to perform a preceding act, the party's performance is not deemed to be conditioned on the third party's consent or performance. *Id.* In the latter situation, the inability to obtain the needed consent or acts of the

**5.** Point Two of Robertson's points on appeal is incorporated by reference in Point Seven of SAFECO's points on appeal. We analyze them jointly.

third party does not excuse performance of the contract. *Id.*

 It appears that much of the delay was due to the time required for Ameren-UE to relocate the utility pole on the west side of the Project, which prevented PRD from working on the west side for a considerable period of time, and delayed Robertson in completing the embankments on the west side. Robertson did not choose the sandy subgrade material that deformed under PRD's paver, nor did Robertson prevent MoDOT from agreeing on the need to add a stabilizer to firm up the sub-grade. Nevertheless, the sub-grade did fail, causing delays and other costs. Robertson did agree to provide an on-site superintendent with certain duties, some of which were to ensure that MoDOT performed the staking in a timely manner. The evidence showed that throughout the course of the Project that MoDOT's staking and grades were inaccurate, which delayed PRD from performing its work until MoDOT performed the staking and grading properly. Under the Agreement, Robertson promised to have the Project site ready for PRD to start work on March 15, 1999. By entering into the Sub–Contract, Robertson implicitly promised to have a site ready for PRD to work thereafter, and promised explicitly to maintain the sub-grade so that it would support construction traffic, which would include PRD's equipment, to have an on-site superintendent, and to give reasonable notice to the MoDOT engineer of intent to perform work to permit proper staking. Nevertheless, nothing appears to limit these promises or otherwise make them conditional, and there was sufficient evidence to support the jury's finding that these promises were made. The trial court did not err in submitting the instruction, nor in denying the

motion for JNOV, nor did it abuse its discretion in denying the motion for a new trial. Point denied.

 In its third point on appeal, Robertson argues that the trial court erred in submitting verdict-directing Instruction No. 15, in failing to grant Robertson and SAFECO a JNOV, in failing to grant a new trial, and in failing to give Robertson's Instruction No. F, because "there was not sufficient competent evidence that Robertson agreed to pay for any alleged extra work and there was substantial evidence supporting the giving of Instruction No. F in that the Subcontract between PRD and Robertson specifically stated that PRD could not receive additional compensation for extra work unless such extra work was specifically authorized in writing by Robertson, in that Robertson did not authorize in writing the extra work, and PRD did not establish that Robertson had waived this provision of the Subcontract by its conduct as a matter of law."[6] Instruction No. 15 stated that the jury should return a verdict in favor of PRD if it believed that: PRD and Robertson entered into an agreement in which PRD agreed to provide base rock and concrete paving and Robertson agreed to pay PRD its final retainage on the Project, and in which PRD agreed to perform various tasks and Robertson agreed to pay PRD for performing these tasks, nearly all of which were not included as part of PRD's obligations in the Sub–Contract; PRD performed all of this work; Robertson failed to pay PRD its retainage or for any of the other work listed in the instruction, thereby damaging PRD.

 The Sub–Contract does require that all change orders be authorized in writing by Robertson. This requirement, however, can be waived. "Habitual

---

6. Point Three of Robertsons' points on appeal is incorporated by reference in Point Eight of SAFECO'S points on appeal. We analyze them jointly.

acceptance of work done on oral change orders in connection with a contract, and payment therefore, results in waiver of a contract clause providing that all orders must be signed." *Brockman v. Soltysiak,* 49 S.W.3d 740, 745 (Mo.App.2001). Parris testified to one example of extra work done pursuant to an oral change order for which PRD was paid, and Holt testified that Robertson paid PRD for some expansion joints. This does not constitute "habitual acceptance." However, waiver of a contractual requirement that change orders be authorized in writing may also be established by presenting evidence that the parties agreed to the orders and the orders were completed. *Id.* The testimony of a single witness, if accepted as true by the trier of fact, can be sufficient to establish an oral contract. *Garren,* 803 S.W.2d at 187. Thus Parris's testimony about extra work allegedly ordered by Robertson and performed by PRD could be sufficient to show that Robertson had ordered the work if the fact finder believed Parris to be credible.

Parris testified concerning the various non-delay damages, including the extra work items listed in Instruction No. 15. For example, Parris stated that Robertson had contacted PRD and wanted to rent some of PRD's equipment to repair the bridge approach slab, and that PRD had provided the equipment necessary for the work, as well as some labor which Robertson had also requested, but that PRD had not been paid for the equipment or labor. Parris also testified that Ben Robertson had asked him to have PRD take measurements at the east end of Route HH, and then provide additional rock for bringing the subgrade up to grade, which was a problem for Robertson, and that PRD took the measurements, provided the extra rock, and was not paid for this. Parris also stated that Robertson asked PRD to hire a trainee in order to help Robertson meet its requirements for using trainees on the Project, that PRD hired a trainee, but was never paid for his trainee wages. There was sufficient evidence that the jury could have reasonably inferred from Parris's testimony that Robertson had agreed to the extra work and that PRD had performed it, thereby waiving the requirement in the Sub Contract that all change orders had to be approved in writing by Robertson. The trial court did not err in submitting Instruction No. 15, nor in failing to submit proposed Instruction No. F, nor in denying the motion for JNOV, nor did it abuse its discretion in denying the motion for a new trial. Point denied.

■■■ For its fourth point on appeal, Robertson contends that the trial court erred in submitting verdict-directing Instruction No. 9, in failing to grant Robertson and SAFECO a JNOV, and in failing to order a new trial because Instruction No. 9 erroneously stated the law regarding a contractor's liability for delays "in that Instruction No. 9 allowed the plaintiff to recover its damages for delay even if Robertson's conduct was not a substantial contributing factor in causing the delays."[7] Instruction No. 9 stated that the jury must return a verdict in favor of Robertson if it believed that PRD's work "was delayed solely as a result of the acts or omissions of the Missouri Highway and Transportation Commission [MHTC], AmerenUE or the Plaintiff [PRD]."

As previously stated, if a party wishes to be excused from performance in the case of various contingencies arising, it is the party's duty to provide this excuse in the

---

7. Robertson's fourth point on appeal is incorporated by reference as SAFECO's ninth point on appeal We analyze them jointly.

contract. *County Asphalt Paving,* 851 S.W.2d at 580. Further, if a party to a contract unconditionally undertakes to perform an act that is not impossible, but merely requires a third party to consent or to perform a preceding act, the party's performance is not deemed to be conditioned on the third party's consent or performance. *Werner,* 10 S.W.3d at 579. Failing to obtain the needed consent or acts of the third party does not excuse performance of the contract. *Id.* Robertson's agreements with PRD regarding the matters that resulted in the delays for which damages were sought were not limited or conditioned. No further discussion is necessary on this point, as the issues of Robertson's promises to PRD and the breaches thereof have already been discussed in our analysis of Robertson's first and second points on appeal. The trial court did not err in submitting Instruction No. 9, nor in denying the motion for JNOV, nor did it abuse its discretion in denying the motion for a new trial. Point denied.

 For its fifth point on appeal, Robertson argues that the trial court erred in failing to grant a JNOV, remittitur, or a new trial, because there was not substantial competent evidence to support the damages claimed by PRD and awarded by the jury, in that: Parris was not qualified to testify as an expert concerning rental rates for PRD's equipment; no foundation was laid to establish that Parris's data and methodology for determining damages was generally accepted by experts in the construction field; that the damages testified to by Parris and awarded by the jury were "excessive and speculative"; damages were improperly awarded for equipment when the equipment was not on the Project site and after the Project was finished; and PRD failed to mitigate its damages.[8]

 We first address Robertson's assertion that Parris was not qualified to testify as an expert. The determination of whether or not a person qualifies as an expert witness, and whether or not his testimony is to be admitted, is a matter of discretion for the trial court and its ruling will not be disturbed on appeal absent a clear showing of abuse. *Cole v. Goodyear Tire & Rubber Company,* 967 S.W.2d 176, 185 (Mo.App.1998) "The essential test of expert opinion evidence is whether it will be helpful to the fact finder." *Fierstein v. DePaul Health Center,* 24 S.W.3d 220, 226 (Mo.App.2000). Testimony ought to be admitted if the expert witness possesses some qualification. *Krame v. Waller,* 849 S.W.2d 236, 240 (Mo.App.1993). A person with substantive practical and specialized experience in an area can qualify as an expert. *Fierstein,* 24 S.W.3d at 226. "Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility....In general, the expert's opinion will be admissible, unless the expert's information is so slight as to render the opinion fundamentally unsupported." *Alcorn v. Union Pacific Railroad Company,* 50 S.W.3d 226, 246 (Mo.2001) (citations omitted).

Parris testified that he had eighteen to twenty years in estimating jobs and that he made estimates at least once per week. Parris also stated that he had experience in charging daily rates, and that his valuation of the equipment in this case was based on his personal experience in the past. In calculating the rate for the delay

---

8. Robertson's fifth point on appeal is incorporated by reference as SAFECO's tenth point on appeal. We analyze them jointly.

damages, Parris testified that he had experience in valuing the equipment of PRD in bidding jobs, that he knew from PRD's past experience what it could earn using such equipment, and that experience in handling "extras" on jobs gave him familiarity with equipment rates. There was a reasonable foundation laid for Parris' testimony about the value of PRD's equipment and the trial court did not abuse its discretion in admitting his testimony.

 Robertson also claims that PRD'S damages were "excessive and speculative." As noted earlier, the main question in reviewing a trial court's denial of a motion for directed verdict or JNOV is whether or not the plaintiff made a submissible case. *Mogley,* 11 S.W.3d at 747. In order to make a submissible case, substantial evidence is required for each and every fact essential to liability. *Id.* The issues of whether or not the evidence is substantial and whether or not the inferences drawn are reasonable present questions of law. *Id.* This court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences. *Id.* Based on a thorough review of the evidence, we believe that there was substantial evidence to support the jury's verdict on PRD's delay damages. Parris testified, based on his experience, about what amounts PRD had been able to earn in the past using its various items of equipment, and on what PRD could have earned had that equipment, especially the paving equipment, not been committed to the Project, with delays that prevented PRD from working on other construction projects. Loss of use is an item of general damage, and can be. a measure for breach of contract cases. *Smith v. Morgan Drive Away, Inc.,* 613 S.W.2d 469, 472 (Mo.App.1981); *Smith v. Gerhardt,* 220 S.W.2d 85, 89 (Mo.App. 1949). Parris also testified that the heavy equipment that PRD used in paving projects were specialized pieces of equipment that no other company operating in southeastern Missouri possessed, and it is reasonable to infer that a company using such equipment could command a premium price. In addition to Parris's testimony, Exhibits 77 to 78 and 80 to 84, which set forth PRD's delay damages and were admitted into evidence without objection, could have reasonably been considered by the jury, and may be properly considered in determining the sufficiency of the evidence to support the verdict, even if the evidence in those exhibits might have been otherwise inadmissible. *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 863 (Mo.1993). There was sufficient evidence to sustain the jury's verdict.

We note that SAFECO in its reply brief asserts that standby equipment that is idle is not covered under its bond. SAFECO did not raise this issue in its after-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, and did not raise this point in its appellant's brief. In order to preserve a point for appellate review, the appellant has to raise the point in its motion for a new trial, and failure to do so preserves nothing for this Court to review. *Sears v. Dent Wizard International Corp.,* 13 S.W.3d 661, 665 (Mo.App.2000); Rules 78.07, 84.13(a). Further, issues not raised in an appellant's opening brief cannot be raised for the first time in the reply brief, and are not properly preserved. *Application of Gilbert,* 563 S.W.2d 768, 771 (Mo.1978); *Decker v. Square D Co.,* 974 S.W.2d 667, 670 n. 2 (Mo.App.1998). *See also Elfrink v. Burlington Northern Railroad Co.,* 845 S.W.2d 607, 615 (Mo.App.1992). Accordingly, this claim was not preserved for this Court to review.

 We turn to Robertson's claim that the trial court erred in failing to grant

remittitur. A trial court has broad discretion in ordering remittitur, and its decision whether to reduce damages awarded by a jury will not be disturbed on appeal unless there is an abuse of discretion that is so exceedingly excessive that it shocks the conscience and convinces an appellate court that both the trial court and the jury have abused their discretion. *Botanicals on the Park, Inc. v. Microcode Corporation,* 7 S.W.3d 465, 470 (Mo.App.1999). In reviewing whether or not a verdict is excessive, this court must consider only the evidence which supports the verdict, and exclude that which disaffirms it. *Id.* We may not weigh the evidence in a jury-tried case. *Armon v. Griggs,* 60 S.W.3d 37, 39 (Mo.App.2001). This court determines only if there is sufficient evidence to support the verdict, and a jury's verdict will not be set aside unless there is a complete absence of evidence to support it. *Southwestern Bell Yellow Pages, Inc. v. Robbins,* 865 S.W.2d 361, 365–66 (Mo.App.1993). Under our standard of review, and having found that there was sufficient evidence to sustain the jury's verdict, we find that the trial court did not abuse its discretion in denying remittitur.

■■■■■ Robertson also asserts that PRD failed to mitigate its damages. Failure to mitigate is an affirmative defense. *Blue Ridge Center Limited Partnership v. Zadeh,* 943 S.W.2d 357, 359 (Mo.App.1997). Rule 55.08 requires that a pleading that sets forth an affirmative defense "shall contain a short and plain statement of the facts showing that the pleader is entitled to the defense or avoidance." Robertson

did raise failure to mitigate as an affirmative defense in its answer, and supported that contention in its pleading in accordance with Rule 55.08,[9] though SAFECO did not.[10] Neither Robertson nor SAFECO requested an instruction on failure to mitigate. Failing to submit an instruction on an affirmative defense waives the defense. *Hopkins v. Goose Creek Land Co., Inc.,* 673 S.W.2d 465, 469 (Mo.App.1984). The trial court did not err in denying the motion for a JNOV, nor did it abuse its discretion in denying the motion for a new trial. Point denied.

■■■■ In its sixth point on appeal, Robertson contends that the trial court erred in denying motions for leave to file a third-party petition to join MHTC and AmerenUE as parties because MHTC and AmerenUE were necessary and indispensable parties in that PRD's claims involved damages caused by the acts and omissions of MHTC.[11]

■■■■■ Under Rule 52.11, if a defendant does not file its third party petition within ten days after filing its original answer, the defendant must obtain leave of court on motion upon notice to all parties to the action. The right to implead a third party is not an absolute, but is a matter within the discretion of the court. *State ex rel. Green v. Kimberlin,* 517 S.W.2d 124, 126 (Mo. banc 1974); *State ex rel. Peavey Company v. Corcoran,* 714 S.W.2d 943, 945 (Mo.App.1986). Discretionary rulings are presumed correct, and this court will only disturb such rulings when the trial court has abused its discretion. *State ex rel.*

---

9. However, the facts pleaded in Robertson's answer raising failure to mitigate as an affirmative defense are not those which it asserts in its brief of this point on appeal.

10. SAFECO, which claimed the affirmative defense that PRD failed to mitigate its damages, did not state any supporting facts to that

effect in its pleading, and has effectively failed to raise the issue, and has waived failure to mitigate as an affirmative defense.

11. Robertson's sixth point on appeal incorporates SAFECO's fifth point on appeal. We analyze them jointly.

*M.D.K. v. Dolan,* 968 S.W.2d 740, 745 (Mo. App.1998). To constitute an abuse of discretion, the trial court's ruling must be so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration. *Id.* If there is any reasonable ground upon which the trial court could have denied leave, there is no abuse of discretion. *State ex rel. Gamble Construction Company, Inc. v. Enright,* 556 S.W.2d 726, 728 (Mo.App.1977). We consider the issue in the light most favorable to the result reached by the trial court. *Enright,* 556 S.W.2d at 728–29.

 The trial court does not have to make a formal statement of its reasons in its order denying a motion for leave to file a third-party petition. *Id.* Failure of the trial court to state its reasons in the order does not automatically result in an abuse of discretion where it is possible to discern that the trial court had a reason for its decision, and this court is not faced with an arbitrary and capricious action that amounts to no exercise of discretion at all, but instead are reviewing the sufficiency of the reasons as bases for the decision on the motion. *Corcoran,* 714 S.W.2d at 946. The record before this Court indicates that the trial court was concerned with delay. The motion for leave to file a third-party petition against AmerenUE was not filed until late November, 1999, nearly eight months after Robertson filed its original answer. The motion for leave to file a third-party petition against MHTC was filed in February 2000, less than a month before the trial date. On the first morning of the trial, March 12, 2001 the court held a meeting in chambers with the counsel for all of the parties at which this subject was discussed and the trial court stated:

> The Court has denied the request for continuance. The case is fourteen months old, it's the third oldest case I have on my docket and that until just a few weeks ago there was no attempt to—attempt made to add a third party or any other party whether it be ... [the] Missouri Highway and Transportation Commission or AmerenUE and that with respect to the experts, this case was on a discovery track, which provided for the disclosure and designation of expert witnesses and the defendant did not timely disclose their expert witnesses.
> In fact, it was just several weeks prior to trial that any such attempt was made, to my knowledge. As far as the Court is concerned that would be prejudice to the plaintiff [PRD] and unfair and certainly would have delayed this case.
> Had the Court permitted you to bring in third parties, this case would have been delayed for another year and a half while further discovery was completed.

In *Corcoran* there was an eight-month delay before the motion for leave was filed, and in *Enright,* the motion for leave was filed six months after the suit began, and only one month before trial. In both cases this Court determined that the trial court had weighed the advantages of granting leave to file the third-party petition against the disadvantages of delay to the plaintiffs, and had properly exercised its discretion in denying leave. The situation at hand is similar to that in *Corcoran* and *Enright.* We find no abuse of discretion. Point denied.

 We next address the remaining points in SAFECO's appeal. To facilitate analysis, we address its points out of turn. In its second point on appeal, SAFECO argues that there was insufficient evidence to show that it was unreasonable and vexatious in not making payment to PRD, as required by statute, and contends that that there was a good-faith dispute as to whether or not Robertson had any liability for

PRD's claims, and that the trial court should have granted judgment in favor of SAFECO or a new trial.

As noted previously, the principal question in reviewing a trial court's denial of a motion for directed verdict or JNOV is whether or not the plaintiff made a submissible case. *Mogley*, 11 S.W.3d at 747. In order to make a submissible case, substantial evidence is required for each and every fact essential to liability. *Id.* The issues of whether or not the evidence is substantial and whether or not the inferences drawn are reasonable present questions of law. *Id.* This court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences. *Id.*

■■■■■ Missouri's statutes providing for damages for an insurer's or surety's refusal to pay on a claim or bond respectively, are penal in nature, and are strictly construed. *State ex rel. Webb v. Hartford Casualty Insurance Co.*, 956 S.W.2d 272, 276 (Mo.App.1997). In order to recover penalties for vexatious refusal to pay, the plaintiff must show that the refusal was willful, and without reasonable cause, as the facts would have appeared to a reasonable person before trial. *Bickerton, Inc. v. American States Insurance Co.*, 898 S.W.2d 595, 602 (Mo.App.1995). If there is an open question of fact or law, an insurer or surety may insist on a judicial determination of such question without facing the statutory penalties for vexatious refusal. *Legg v. Certain Underwriters at Lloyd's of London*, 18 S.W.3d 379, 387 (Mo.App.1999). The existence of a litigable issue, however, does not protect the insurer or surety from a penalty when there is other evidence that the refusal was vexatious and recalcitrant. *State ex rel. Webb*, 956 S.W.2d at 276.

PRD asserts in its brief that SAFECO made an inadequate denial of its claim and an inadequate investigation, each of which may be considered evidence of vexatiousness. *State of Missouri ex rel. Pemiscot County v. Western Surety Company*, 51 F.3d 170, 174 (8th Cir.1995) (applying Missouri law); *Allen v. State Farm Mutual Auto. Insurance Company*, 753 S.W.2d 616, 620 (Mo.App.1988).

■■■ Missouri courts have expressly held that a surety for a solvent principal need not independently investigate a claim on a bond to avoid a penalty for vexatious refusal. *Pemiscot County*, 51 F.3d at 174. *See also General Plywood Corporation v. S.R. Brunn Construction Company*, 511 S.W.2d 905, 912 (Mo.App.1974). If a surety rejects a claim in deference to its principal, the surety is protected from vexatious refusal penalties only when the record demonstrates that the principal presented a reasonable, if unsuccessful, defense. *Pemiscot County*, 51 F.3d at 174; *General Plywood Corp.*, 511 S.W.2d at 912.

The record before this court does not reflect sufficient evidence to prove vexatious refusal to pay by SAFECO. PRD's letter of December 10, 1999, did not explicitly state that PRD was making a demand under the surety bond between SAFECO and Robertson for breaches of contract by Robertson. The letter did not claim that Robertson had breached the Sub–Contract, and did state that the principal causes for delay were AmerenUE's failure to move the high voltage power lines, MoDOT's providing an inadequate sub-grade, and MoDOT's persistent failure to stake and grade properly and in a timely fashion. Lacking an explicit demand on the bond in the December 10th letter, SAFECO was not unreasonable in failing to consider this to be a demand letter.

Hester of SAFECO sent claim forms to PRD and began an investigation after receipt of the December 10th letter, even

though her review of the letter indicated to her that PRD's claims were directed against MoDOT, not Robertson, the principal, and that PRD was not claiming that Robertson had breached the Sub–Contract. Hester testified that prior to PRD's filing suit, she had talked with Robertson's representatives, who had told her that PRD was blaming MoDOT, and Robertson concurred that the problems were MoDOT's responsibility. Hester further stated that after the lawsuit was filed, she spoke again with Robertson's representatives, who informed her that it disputed PRD's allegations that it had breached the Sub Contract, and that it had a counterclaim against PRD. She declared that her investigation was limited after the lawsuit began because she could no longer contact PRD directly as it was represented by counsel, and that it was restricted to what could be obtained through the discovery process in litigation. She stated that she understood Robertson's letter of July 14, 2000 to MHTC concerning PRD's damages, written by Holt, with an affidavit from Parris, and an affidavit from Holt, was merely passing along PRD's asserted claims to MHTC. Hester believed that this letter was not an admission of legal responsibility by Robertson, and merely followed the procedure under the Contract for submitting the claim of a sub-contractor. She testified that she had no reason to believe that Robertson's defense lacked merit. SAFECO did not provide details in its answer to PRD's petition to explain why it was denying PRD's claim, other than on information and belief that Robertson had paid PRD all sums that were due. However, SAFECO stated in an admission that after it had received PRD's letter of December 10, 1999, Robertson had advised SAFECO that "since all of PRD's allegations related to the acts or omissions of MoDOT, which in PRD's opinion caused extra costs to PRD, any claim that PRD had was against MoDOT and not Robertson." This was an adequate explanation for SAFECO's denial.

Robertson's defenses were not without merit. There were open questions of fact and law relating to whether or not Robertson had made unconditional promises to PRD. Parris could not remember who had made the promise that the site would be ready for PRD by March 15, 1999, Holt or Ben Robertson. Holt testified that he made no such promise. There was testimony that Robertson's representatives had expressed hope to have the site ready by March 15th, without an expression of a promise. The Specifications, Contract, and Sub–Contract were not always clear about which party was intended when the term "contractor" was used. There was testimony that Robertson had a superintendent on the Project, though not the one initially designated as such, and not directly overseeing PRD's work. There was testimony that the subgrade material selected by MHTC was adequate and of the sort routinely used on MHTC projects. There were legal issues in dispute concerning whether or not the Sub–Contract was a fully integrated document.

Based on a thorough review of the record, we conclude that SAFECO's refusal to pay PRD's claim was not unreasonable, vexatious, or recalcitrant.[12] Point sustained.[13]

 In its fourth point on appeal, SAFECO argues that the trial court erred by excluding evidence from MoDOT's letter of February 22, 2001 to Robertson

---

12. SAFECO's third point on appeal is moot, for without the underlying claim of vexatious refusal to pay, the award of attorneys' fees to PRD cannot be sustained.

13. SAFECO's first and third points on appeal are rendered moot by our sustaining its second point on appeal, and there is no need to discuss them.

**44**

because the evidence was relevant and not inadmissible as an offer of settlement, but was rather an administrative ruling, and because the MoDOT ruling in the letter was relevant "(1) to establish that Robertson had not been paid by the MHTC and (2) to rebut evidence submitted by PRD concerning the validity of claims submitted by Robertson to the MHTC on behalf of PRD."

Admitting or excluding evidence is a matter within the discretion of the trial court, and our review is limited to an abuse of discretion standard. *Caples v. Earthgrains Company*, 43 S.W.3d 444, 452 (Mo.App.2001). We give substantial deference to a trial court's decision to admit or exclude evidence. *Id.*

■ MHTC's letter of February 22, 2001 was an inadmissible offer of settlement, even though it involved a third party.[14] Proof of compromise or settlement with a third party is not admissible to prove the validity or invalidity of a claim. *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 392 (Mo.App.1998). SAFECO in its brief also argues that even if the letter were an offer of settlement, it would still be relevant "to the issue of whether SAFECO's failure to pay was vexatious...." As we have sustained SAFECO's second point on appeal, and reversed the trial court on the issue of vexatious refusal to pay, the issue is moot. We find no abuse of discretion. Point denied.

14. The letter of February 22, 2001, stated in part that:

The Claims Committee reviewed all items submitted by Robertson Contractor's claim and by PR Developers (PRD), the paving subcontractor in the subject claim relating to possible contractor delays. MoDOT offers $110,293.84 as complete and full compensation for any and all delays to the contractor and all subcontractors on this project associated with any alleged delays for design plan errors and/or staking errors. The part of your claim relating to

We affirm the judgment of the trial court as to the verdicts against Robertson and SAFECO for PRD's breach of contract claims, and reverse the judgment of the trial court as to the verdict against SAFECO awarding damages to PRD for vexatious refusal to pay and for attorneys' fees.[15]

GARY M. GAERTNER, P.J., and PAUL J. SIMON, J., concur.

alleged utility delays is denied. The above amount represents MoDOT's final offer of compensation for this claim.

Please respond in writing of your decision concerning this offer within ten days after receipt of this correspondence. Acceptance of this settlement must include a release from PRD as well.

15. The motion of Robertson and SAFECO to strike PRD's brief is denied. PRD's motion to strike SAFECO's second point on appeal is denied.