**Sylvanus Brian McBRYDE,**
**Respondent,**

v.

**RITENOUR SCHOOL DISTRICT,**
**Appellant.**

No. ED 86592.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 3, 2006.

Application for Transfer Denied
Dec. 19, 2006.

Thomas A. Mickes, Natalie A. Hoernschemeyer, Chesterfield, MO, for appellant.

D. Eric Sowers, Ferne P. Wolf, St. Louis, MO, Jefferson City, MO, for respondent.

Penney R. Rector, Jefferson City, for amicus curiae.

NANNETTE A. BAKER, Presiding Judge.

### Introduction

Ritenour School District ("Ritenour") appeals from the judgment of the trial court in favor of Sylvanus Brian McBryde ("McBryde"). Ritenour claims four points on appeal. First, it claims the trial court erred in denying its Motions for Directed Verdict and Judgment Notwithstanding the Verdict because McBryde failed to make a submissible case of race discrimination under the Missouri Human Rights Act ("MHRA"). Second, Ritenour claims the trial court erred in submitting McBryde's offered verdict director to the jury and in not submitting its verdict director because McBryde's was a "not-in-

MAI" instruction and it did not follow the substantive law of discrimination under the MHRA. Third, Ritenour claims the trial court erred in refusing its offered Jury Instruction C because to deny the "Business Judgment Instruction" is reversible error since a business has a right to make a business decision absent unlawful discrimination. Fourth, Ritenour claims the trial court erred in refusing its tendered Jury Instruction D since failure to offer the "same decision" instruction is reversible error because the instruction followed substantive law. We find no error and affirm.[1]

### Factual Background and Proceedings Below

The evidence viewed in a light most favorable to the verdict is as follows:

McBryde worked for the Special School District and was assigned to Ritenour High School as a teacher's assistant. He was also employed by Ritenour High School as an assistant basketball coach at the high school for three seasons between 2000 and 2003. Before he was hired, McBryde was interviewed by the head basketball coach, Jason Graves ("Graves"). Graves told McBryde, who is African-American, that he needed a black assistant coach who could relate to the black players on his team.

A memorandum of understanding served as the contract for coaching during the season. A coach could not be paid until he received his signed contract and returned a signed copy. McBryde earned between $2,964.00 and $3,241.00 per season. The school's basketball season began on October 15 each year and ended at the end of February.

McBryde received his contract for the 2000–2001 season on January 3, 2001. It was authorized by the Ritenour Board of Education and it was signed by the Superintendent of Schools on December 19, 2000. His 2002–2003 contract was authorized by the Ritenour Board of Education and it was signed by the Superintendent of Schools on January 19, 2003. During the three years he coached at Ritenour High School, McBryde was never given a signed contract before the season began. McBryde's 2001–2002 contract was not in evidence.

On the other hand, during the same time period, a white assistant basketball coach, Garth Scott ("Scott") always received his contract before the basketball season began. Scott's 2002–2003 school year coaching contract was authorized by the Ritenour Board of Education and signed by the Superintendent of Schools on June 27, 2002. Scott's 2000–2001 contract was authorized by the Ritenour Board of Education and signed by the Superintendent on July 28, 2000.

As assistant varsity coach, McBryde's duties included running drills, discussing the philosophy of the game and teaching the fundamentals of basketball. McBryde was also the head coach for the junior varsity basketball team where he coached and substituted players at the games.

In the beginning of the 2001–2002 school year, the principal, Bill Korte ("Korte") told Graves that he had concerns about McBryde as a role model for student athletes. Korte stated that he did not like the negative ways McBryde "carried himself around the school."

Korte requested that McBryde be given a written job description detailing his

---

1. This court has reviewed the Motion taken with the case. Respondent's Renewed Motion to Request Attorneys' Fees is denied.

duties, expectations and demeanor while coaching basketball, however, he did not request one for the white assistant coaches.

On December 12, 2001, Scott had a loud argument with McBryde. The argument concerned an encounter that occurred the previous day between McBryde and Scott's wife, another Ritenour teacher. Scott threatened McBryde if he ever invaded Scott's wife's personal space again. Graves was present and witnessed the argument. Kerry Reid, the athletic director, and Korte reprimanded Scott for his conduct towards McBryde.

In the fall of 2002, Scott was hired by Ritenour as a full-time teacher at Ritenour High School, in addition to his job as assistant basketball coach for the 2002–2003 season. By contrast, McBryde was employed by the Special School District and was assigned to Ritenour as a teaching assistant. Ritenour High School only employed him during the basketball season.

On May 15, 2003, the high school held an open gym night. Students as well as adults played basketball. Scott was supposed to supervise the open gym that night. When Graves told Scott that McBryde would be attending and playing at the open gym, Scott told McBryde he had decided to stay home and cut his grass instead. Because of Scott's decision, McBryde was the only school official present at the open gym. Since basketball season was over, the Special School District actually employed McBryde. He was not a Ritenour High School employee. There was an altercation that night during the open gym between an unidentified adult and a student, Ronald Cornell ("Cornell"). Cornell was injured in the incident.

McBryde attempted to break up the confrontation and keep the violence from escalating. By the time McBryde cleared the gym, Cornell had left with his friends. McBryde knew Cornell only by the initials "OC" so he was unable to track the student to his home. That night, he called Ingrid Clark Jackson ("Clark Jackson"), an assistant principal at Ritenour, and told her what had happened. Clark Jackson told McBryde to make a written report of the incident and meet with her the next day.

At the request of Korte, Clark Jackson interviewed students and prepared a written report regarding the open gym incident. She sent a copy of her incident report to Korte and to Assistant Superintendent David Hoefakker ("Hoefakker"). After reviewing the report, Hoefakker wrote a letter to the Special School District requesting that McBryde be excluded from the school district based solely on the incident at the May 15, 2003 open gym night. Further, in his letter, Hoefakker referenced a six-pointed star tattoo that McBryde had, and inferred that the tattoo was a symbol of gang affiliation.[2] Near the end of the letter, Hoefakker admitted that his mention of the possible gang affiliation "include[d] a certain amount of conjecture." He listed several reasons why he was asking the Special School District to exclude McBryde from "our District." These included McBryde's failure to call the police after the incident; his violation of the rule that only students may participate in open gym; his violation of the rule that an open gym supervisor may not play; his failure to seek medical attention for Cornell; his delay in notifying Ritenour authorities of the incident; and his invita-

---

**2.** McBryde testified that he got his six-pointed star tattoo when he played professional basketball in Israel. The six-pointed star, also known as a "Star of David" appears on the Israeli flag. Also, in Clark Jackson's report, only one student mentioned that he believed that the adult involved in the incident also had a six-pointed star tattoo.

tion to the adults who were involved in the incident. According to Hoefakker, he conferred with Korte and Clark Jackson, as well as legal counsel, before he wrote the letter to the Special School District.

Graves admitted that before the May 15, 2003 incident there were no Ritenour written rules concerning open gym, but that the coaches were told to follow the Missouri State High School Activities Association ("MSHSAA") rules. He also admitted that there was no rule that open gym was only for Ritenour students; that he had allowed non-Ritenour students as well as adults to play at an open gym when he was in charge; and that the only copy of the MSHSAA rules was kept in the athletic director's office, inaccessible to the coaches.

On May 20, 2003, Graves sent a memo to Korte regarding open gym. In that memo, he stated that he "spoke with [McBryde] on Friday, May 2 about not having people play in open gym from outside of school." In the memo, Graves also stated that he specifically told McBryde on May 15, 2003, before the open gym night, that if individuals were not Ritenour students, they could not play in open gym.

On May 27, 2003, Korte sent McBryde a memo regarding his Ritenour High School duties and responsibilities. Korte stated that the district was carefully reviewing the incident that occurred on May 15 "related to adherence of standard operating procedures of Ritenour High School."

Later that day, McBryde was suspended from his Special School District duties with pay and escorted out of the high school building by the area coordinator. McBryde was later notified that his coaching contract would not be renewed. According to Korte, Hoefakker made the decision not to renew McBryde's contract for the 2003–2004 season and Korte did not play any role in that decision.

Before McBryde's suspension, other basketball coaches had been disciplined through verbal reprimands. No one had been suspended. In December, 2001, David Fuchs ("Fuchs"), was verbally reprimanded when he failed to adequately supervise an open gym night in which one student broke another student's jaw during an altercation. Scott received a verbal reprimand after receiving so many technical fouls while coaching games during the 2001–2002 basketball season that he was unable to finish coaching the season. Nothing concerning this reprimand was placed in Scott's personnel file. Scott also received a verbal reprimand after threatening McBryde, an action that Graves witnessed.

McBryde filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and with the Missouri Commission on Human Rights ("MCHR"). Both agencies issued Right to Sue letters to McBryde. The MCHR letter indicated that McBryde had ninety days to file a civil action. On February 13, 2004, McBryde filed a petition charging Ritenour with race discrimination under the MHRA.

The case was tried by a jury from April 4, 2005 through April 7, 2005. During the trial, Ritenour moved for a Directed Verdict at the close of McBryde's evidence and again at the close of all the evidence. The trial court denied both motions. The jury returned a verdict for McBryde and awarded him $3,241.00 against Ritenour. On April 7, 2005, the trial court entered judgment for McBryde in the amount of $3,241.00. On May 2, 2005, the trial court issued an amended judgment awarding McBryde $3,241.00 in actual damages. On his additional claims for attorneys' fees and costs and equitable relief, the trial court awarded McBryde $69,000.00 in at-

torneys' fees, $4774.86 in costs and ordered the expungement of his personnel records at Ritenour.

### Discussion

The MHRA, Section 213.010[3] et seq., protects important societal interests in prohibiting discrimination in employment, public accommodation, and other interests on the basis of sex, race, color, religion, national origin, ancestry, age as it relates to employment, disability, or familial status as it relates to housing. *State ex rel. Dean v. Cunningham,* 182 S.W.3d 561, 565 (Mo. banc 2006). The Act provides for broad enforcement authority in the Missouri Human Rights Commission and for administrative remedies. *Id.* In addition, to further this societal interest in eliminating discrimination, the Act allows a claimant to seek damages for actual and punitive damages, court costs, and reasonable attorney fees. *Id.* at 565–566. The Act, in allowing a claim for damages, shows legislative intent to include private claims for relief by aggrieved employees and others, to further the enforcement of the statute. *Id.*

■■■ The MHRA and Title VII[4] are coextensive, *but not identical,* acts. *Hammond v. Municipal Correction Institute,* 117 S.W.3d 130, 136 (Mo.App. W.D.2003). (emphasis added). These statutes create different causes of action. *Id.* Missouri Courts have adopted federal Title VII case law when interpreting analogous discrimination statutes in the Missouri Human Rights Act. *Id.* at 137. However, the MHRA is not merely a reiteration of Title VII. *Id.* The Act is in some ways broader

than Title VII, and in other ways is more restrictive. *Id.* If the wording in the MHRA is clear and unambiguous, then federal case law which is contrary to the plain meaning of the MHRA is not binding. *Id.*

### Jury Instructions

■■■ Ritenour asserts three claims of error regarding the trial court's refusal to submit its tendered instructions to the jury. In reviewing an instruction, this Court views the evidence and the inferences in the light most favorable to the instruction, and disregards contrary evidence. *Missouri Dep't of Transp. ex rel. P.R. Developers, Inc. v. Safeco Ins. Co. of Am.,* 97 S.W.3d 21, 31 (Mo.App. E.D.2002). We will reverse on instructional error only where the instruction misled, misdirected, or confused the jury, and the instruction resulted in prejudicial error. *Id.*

### I. Verdict Director

In its second point relied on, Ritenour claims that the trial court erred in submitting McBryde's offered verdict director to the jury and in not submitting its verdict director. Ritenour contends that McBryde's offered verdict director did not follow the substantive law of discrimination based on race under the MHRA.

■■■ Rule 70.02[5] governs instructions to juries. *Criswell v. Short,* 70 S.W.3d 592, 594 (Mo.App. S.D.2002). To require the giving of a non-MAI instruction, a party must prove that the MAI instructions submitted to the jury misstate the law. *City of Kansas City v. Habelitz,* 857 S.W.2d 299, 303 (Mo.App. W.D.1993).

---

**3.** All statutory references are to RSMo.2004, unless otherwise indicated.

**4.** Title VII of the Civil Rights Act of 1964, as amended in 1991, was enacted to prohibit discrimination by employers on the basis of

race, color, religion, sex or national origin. 42 USC 2000–e.

**5.** All rule references are to Mo. Rules Civ. P.2004, unless otherwise indicated.

When there is no applicable MAI instruction, a non-MAI instruction may be given if it conforms to the requirements of Rule 70.02 in that it is simple, brief, impartial and free from argument. *Id.*

McBryde tendered an instruction based on Missouri Approved Instruction ("MAI") 31.24,[6] Verdict Directing—Employment Discrimination—Missouri Human Rights Act:

> Your verdict must be for plaintiff Sylvanus McBryde if you believe:
>
> First, defendant Ritenour School District refused to offer a coaching contract to plaintiff Sylvanus McBryde, and
>
> Second, that plaintiff Sylvanus McBryde's race was a *contributing factor* in such refusal to offer him a coaching contract, and
>
> Third, as a direct result of such conduct, plaintiff Sylvanus McBryde sustained damage. (emphasis added).

Ritenour tendered Instruction B, which reads, in its entirety, as follows:[7]

> Your verdict must be for plaintiff and against defendant Ritenour on plaintiff's race discrimination claim if all of the following elements have been proved by the greater weight of the evidence:

First, defendant failed to extend a new coaching contract for the 2003–2004 school year to plaintiff; and

Second, plaintiff's race was a *motivating factor* in defendant's decision.

If either of the above elements has not been proved by the greater weight of the evidence, your verdict must be for defendant and you need not proceed further considering this claim. (emphasis added).

Ritenour further argues that MAI 31.24 misstates the substantive law of discrimination under the MHRA by allowing the jury to give a verdict for McBryde if it finds that race is a contributing factor rather than a motivating factor. Ritenour would have us believe that "motivating factor" is a higher threshold for a plaintiff to meet than "contributing factor." In fact, in its brief, Ritenour uses the term "motivating factor" interchangeably with "determining factor" and "substantial factor." But nowhere in Title VII, the Eighth Circuit's model jury instructions or the MHRA is the standard for discrimination set forth as a "substantial" or "determining" factor. Indeed the Eighth Circuit's Model Instruction 5.01 states that "[t]he

**6.** MAI 31.24 was approved March 7, 2005 and became effective July 1, 2005. The trial took place in April 2005. Prior to that, there was no MAI instruction for the claim of discrimination based on race under the MHRA. MAI 31.24 reads, in its entirety:

> Your verdict must be for plaintiff if you believe:
>
> First, defendant (here insert the alleged discriminatory act, such as "failed to hire", "discharged" or other act within the scope of Section 213.055, RSMo) plaintiff, and
>
> Second, (here insert one or more of the protected classifications supported by the evidence such as race, color, religion, national origin, sex, ancestry, age, or disability) was a *contributing factor* in such (here, repeat alleged discriminatory act, such as "failure to hire", "discharge", etc.), and

> Third, as a direct result of such conduct, plaintiff sustained damage.
>
> * [unless you believe plaintiff is not entitled to recover by reason of Instruction Number (here insert number of affirmative defense instruction)].

(emphasis added). The Order accompanying MAI 31.24 reads, in pertinent part: "2. The Instructions, Notes on Use and Committee Comments revised as set forth in the specific exhibits attached hereto *must be used on and after July 1, 2005, and may be used prior thereto; any such use shall not be presumed to be error.*" (emphasis added).

**7.** This instruction is based on the Eighth Circuit Model Instruction 5.01.

Committee believes that the phrase 'motivating factor' should be defined." In fact "motivating" is defined as *playing a part* or playing a role in the decision and continues to instruct the jury that the plaintiff's race need not have been the only reason for the decision.[8] (emphasis added).

The plain meaning of words supply their statutory definition unless the legislature provides a definition. *Delta Air Lines, Inc. v. Dir. of Revenue, State of Missouri*, 908 S.W.2d 353, 356 (Mo. banc 1995). The plain meaning is found in the dictionary. *Id. See also State v. Daniel*, 103 S.W.3d 822, 826 (Mo.App. W.D.2003). Since the term "contributing" factor is not defined in the MAI, we look to the dictionary for its plain meaning. Webster's Third New International Dictionary defines "contributing" as "that contributes a share in anything or has a part in producing the effect."[9] Given the similarity between the definitions for "motivating" and "contributing", we are not persuaded by Ritenour's attempts to convince us that motivating factor is a higher threshold than contributing factor.

■ Discrimination is defined in section 213.010 as "*any unfair treatment* based on race, color, religion, national origin, ancestry, sex, age as it relates to employment ...*" (emphasis added). Therefore, in enacting the MHRA, the legislature sought to prohibit any consideration of race or other improper characteristic no matter how slight in employment decisions. The plain meaning of the MHRA imposes liability on an employer when an improper consideration is a contributing factor, regardless if other factors also exist. The plain language of the statute does not require a plaintiff to prove that discrimination was a substantial or determining factor; a plaintiff need only demonstrate that discrimination was a contributing factor in the employment decision.

Therefore, we cannot say that the verdict director misstated the substantive law under the MHRA. Accordingly, the trial court did not err in submitting MAI 31.24, the verdict directing instruction to the jury. Point denied

## A. Jury Instruction C

■ In Ritenour's third point relied on, it claims that the trial court erred in refusing its offered Jury Instruction C, a business judgment instruction. Ritenour contends that denying this instruction to the jury when it is offered by a defendant in an employment discrimination case is reversible error because the school district has a right to make a business decision absent unlawful discrimination.

Ritenour's proposed Jury Instruction C reads "[y]ou may not return a verdict for plaintiff just because you might disagree with defendant Ritenour's action or believe it to be harsh or unreasonable." The tendered instruction references the "Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2001 Edition) 5.58 (modified)".[10]

---

8. Eighth Circuit Model Instruction 5.96.

9. Webster's Third New International Dictionary of the English Language Unabridged 476 (Philip Babcock Gove, ed.1976).

10. The meaning of this reference is unclear. The 2005 Eighth Circuit Manual of Model Civil Jury Instructions contains a nearly identical instruction 5.94 titled "Business Judgment—Title VII Cases." We found case references prior to 2001 citing the business judgment instruction of the 8th Circuit also as 5.94. The manual contains no 5.58 instruction. For the sake of analyzing this point on appeal, we assume that Ritenour is actually referencing Eighth Circuit Instruction 5.94 and not 5.58.

Ritenour argues that we should follow the Eighth Circuit, which holds that in employment discrimination cases, a business judgment instruction is crucial to a fair presentation of the case, and the district court must offer it whenever it is proffered by the defendant. *Langlie v. Onan Corp.*, 192 F.3d 1137, 1141 (8th Cir. 1999).

There is no case law in Missouri concerning the business judgment instruction and its use in MHRA cases for discrimination based on race. Although we may look to the Eighth Circuit for guidance, we are not bound to follow its case law. *See e.g. Trimble v. State of Missouri*, 693 S.W.2d 267, 276 (Mo.App. W.D.1985); *Dillman v. Missouri Highway and Transp. Comm'n*, 973 S.W.2d 510, 513 (Mo.App. E.D.1998). Moreover, in employment discrimination cases, the controlling law in the Eighth Circuit is Title VII. In Missouri, these cases fall under the MHRA. If the Missouri Supreme Court had wished to adopt the language of the Eighth Circuit's model jury instruction regarding the business judgment instruction, it could have done so when it drafted and subsequently adopted MAI jury instructions specifically addressing the MHRA.[11]

Furthermore, the Eighth Circuit is the only circuit that has held that failure to give the business judgment instruction in either a Title VII or a state human rights act claim is reversible error. *See, e.g., Julian v. City of Houston, Texas*, 314 F.3d 721, 727 (5th Cir.2002); *Trident Inv. Mgmt., Inc. v. Amoco Oil Co.* 194 F.3d 772, 780 (7th Cir.1999); and *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 350–351 (1st Cir.1998). Since this case was tried under the MHRA rather than Title VII, it was

not error for the trial court to refuse the business judgment instruction. This point is denied.

### B. Jury Instruction D

In its fourth point relied on, Ritenour alleges that the trial court erred in refusing its tendered Jury Instruction D, a "same decision instruction." Ritenour contends that even if it did consider illegitimate factors in not renewing McBryde's contract, it would have made the same decision regardless. Specifically, Ritenour claims that the trial court's failure to offer the instruction to the jury when tendered by a defendant in an employment discrimination case is reversible error and Ritenour was prejudiced by such failure. It further argues that the instruction followed substantive law and there was evidence offered to support that defense.

Ritenour's proposed Jury Instruction D reads:

[i]f you find in favor of plaintiff under Instruction _____, then you must answer the following question in the verdict form: Has it been proved by the greater weight of the evidence that defendant would not have extended a new coaching contract for the 2003–2004 school year to plaintiff regardless of his race?

The tendered instruction references the Eighth Circuit Model Jury Instruction 5.01A.[12]

Ritenour relies on *Swyers v. Thermal Science, Inc.* for the proposition that "Missouri recognizes a same decision defense in employment discrimination claims." 887 S.W.2d 655, 656–657 (Mo.App. E.D.1994). However, *Swyers* can be distinguished

---

11. *See* MAI 31.24 and 31.25.

12. The Eighth Circuit Manual of Model Civil Jury Instructions instruction 5.01A is titled

"Title VII—'same decision'" and is nearly identical in form to Ritenour's submitted instruction.

from the case before us. In *Swyers*, the plaintiff appealed from a grant of summary judgment in favor of the defendant in her sex discrimination suit under the MHRA. *Id.* at 656. The defendant relied on the "after acquired evidence" defense, stating that even if it did discriminate against the plaintiff based on her sex, it would have refused to hire her anyway because she falsified information on her applications.[13] *Id.* The defendant showed that it did check on past work history for each employee and that it would refuse to hire any employee who falsified an application. *Id.* at 657. Therefore, since the defendant had shown consistent behavior under its hiring policy, the court held that summary judgment was appropriate. *Id.*

 In the case at bar, Hoefakker, by his own admission, made the decision not to renew McBryde's contract based solely on the incidents of the May 15, 2003 open gym night. Ritenour could not demonstrate a consistent pattern of behavior with regard to its treatment of McBryde and its treatment of the other coaches when there were problems with the coaches' judgment or behavior. Additionally, *Swyers* was decided prior to *State ex rel. Diehl v. O'Malley*,[14] so it does not address the issue of the

giving of a jury instruction on the "same decision" defense.

Additionally, Ritenour's proposed jury instruction is an Eighth Circuit instruction pertaining to Title VII, not an MAI instruction pertaining to the MHRA. Ritenour has failed to demonstrate any provision of the MHRA that allows for the same decision defense as a bar to recovery against discriminatory behavior by the employer.

Notwithstanding, Ritenour fails to establish that it would have not renewed McBryde's contract solely based on the open gym incident. There is ample evidence that Ritenour disciplined McBryde more severely than it disciplined the white coaches. This underscores that McBryde was treated differently from the other coaches. Again, Missouri courts are not bound to use an Eighth Circuit Title VII Jury Instruction, thus we cannot find that the trial court's failure to offer Ritenour's Jury Instruction D is reversible error. Point denied.

### *Directed Verdict and JNOV*

In its first point on appeal, Ritenour claims the trial court erred in denying its Motions for Directed Verdict and Judgment Notwithstanding the Verdict because

13. Plaintiff had applied to work for defendant on three separate occasions. *Id.* In each application there were discrepancies from her actual work history as well as between the applications. *Id.* She argued that the defendant would not have discovered her falsified application if it had hired her rather than discriminating against her. *Id.*

14. 95 S.W.3d 82 (Mo. banc 2003). In *Diehl*, the Missouri Supreme Court held that a discrimination claim for damages only filed under the MHRA is entitled to a trial before a jury under the Missouri Constitution. *Id.* at 84. The court reasoned that "the present case—an action for damages for discrimination based upon age, sex and retaliation for filing a discrimination complaint—is analo-

gous to those kinds of actions triable by juries at the time of the Constitution of 1820." *Id.* at 87. Further, the court held that the plaintiff's claims in a discrimination claim under the MHRA "are conceptually indistinguishable from other statutory actions for damages that traditionally have carried the right to a jury trial." *Id.* at 88. Likening the discrimination claim for damages to a wrongful death claim or a claim for retaliation, neither of which existed at the time of the Missouri Constitution of 1820, the court held that the civil action for damages for a personal wrong was the kind of case that was triable by juries since the inception of the state's constitution. *Id.* at 88, 92.

McBryde failed to make a submissible case of race discrimination under the MHRA. Specifically, Ritenour alleges that McBryde failed to prove a prima facie case of discrimination since he did not meet its legitimate expectations. Ritenour argues that for McBryde to make a submissible case of discrimination, "he needed to prove every element of his claim of race discrimination under the [MHRA]." It further maintains that the MHRA's analysis for race discrimination "parallels federal anti-discrimination statutes." Ritenour also contends that Hoefakker did not know that McBryde was African–American at the time he made the decision not to renew McBryde's contract and therefore his decision could not have been motivated by race or discriminatory. Additionally, since Ritenour hired an African–American male to fill McBryde's position the following year, it argues that the non-renewal of McBryde's contract could not be discriminatory.

 In reviewing a denial of a motion for judgment notwithstanding the verdict, review is essentially the same as for review of a denial of a motion for directed verdict—we review the record to determine whether the plaintiff made a submissible case. *Daniels v. Board of Curators of Lincoln Univ.*, 51 S.W.3d 1, 5 (Mo.App. W.D.2001). In determining whether the evidence was sufficient to support the jury's verdict, we view the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences which conflict with that verdict. *Id.* If the record contains probative facts to support the conclusion reached by the jury, we will affirm. *Id.* If a party makes a case under any theory submitted to the jury, the motion for directed verdict and motion for judg-

ment notwithstanding the verdict are properly denied. *Id.*

MHRA Section 213.055 reads, in pertinent part:

1. It shall be an unlawful employment practice:

(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:

(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability;

 In the case at bar, the jury believed that Ritenour discriminated against McBryde during his employment as an assistant basketball coach that eventually led to the non-renewal of his contract. He established that he did not receive his coaching contract until mid-season, while Scott always received his contract before the season began. McBryde also established that white coaches were disciplined with verbal reprimands while he received an immediate suspension.

There were also discrepancies in the evidence before the jury. Specifically, Graves testified that there were no rules for open gym before May 15, 2003, and that outsiders were allowed to participate, but his memo to Korte stated that the coaches were given verbal rules regarding no outsider participation in the open gym. The memo also stated that Graves had told McBryde on two different occasions, May 2, 2003, and May 15, 2003 before the open gym night, that anyone who was not a Ritenour student could not play in an open gym. On the other hand, Graves testified that he had allowed non-Ritenour students to participate in open gym during the

school year. Korte testified that he "played no role" in Hoefakker's decision not to renew McBryde's contract. However, Hoefakker testified that he conferred with Korte and Clark Jackson while he was preparing the letter to the Special School District asking for McBryde's removal. The evidence of disparate treatment as well as the inconsistencies in the evidence could certainly lead a reasonable jury to believe that McBryde made a submissible case of discrimination against Ritenour. Therefore, the trial court correctly denied Ritenour's motion for a directed verdict. Point denied.

Accordingly, we affirm the judgment of the trial court.

ROBERT G. DOWD, JR., J., and SHERRI B. SULLIVAN, J., concur.